COMMONWEALTH vs. MICHAEL J. BRANDWEIN.

Barnstable. September 7, 2001. - January 14, 2002.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Privileged Communication. Doctor,* Privileged communication. *Evidence,* Privileged communication, Admissions and confessions. *Constitutional Law,* Admissions and confessions. *Practice, Criminal,* Admissions and confessions, Voluntariness of confession.

Assuming that a psychiatric nurse's revelation to a police officer of a communication made to the nurse by a criminal defendant regarding his possession of a gun and his involvement in a bank robbery constituted a violation of the nurse's professional obligation to keep patient communications confidential, the revelation, which was made at the nurse's place of business, did not violate G. L. c. 223, § 20B, which creates only an evidentiary privilege applicable to various proceedings, and does not mandate confidentiality or prohibit disclosure in other settings; moreover, the defendant's later confession did not need to be suppressed at his criminal trial as fruit of the poisonous tree, where the record was devoid of anything to suggest that the police officer did anything to solicit, provoke, or tempt the nurse into making her disclosures. [628-633]

The confession of a criminal defendant was not rendered involuntary by the defendant's distraught emotional state, combined with a police officer's recommendation that the defendant be "forthright" and "clear a slate," where the defendant was coherent, lucid, and articulate, and did not appear to be under the influence of drugs or alcohol; and where the officer's recommendation was no more than a general admonition to tell the truth and was devoid of any implication that doing so would result in more lenient treatment. [633-634]

INDICTMENT found and returned in the Superior Court Department on May 26, 1998.

A pretrial motion to suppress evidence was heard by *Richard F. Connon,* J., and the case was heard by *Gerald F. O'Neill, Jr.,* J.

The Supreme Judicial Court granted an application for direct appellate review.

*Carlo A. Obligato,* Committee for Public Counsel Services, for the defendant.

*Julia K. Holler*, Assistant District Attorney, for the Commonwealth.

SOSMAN, J. The defendant appeals from his conviction of armed robbery while masked, contending that his communications with a psychiatric nurse were wrongfully disclosed to the police and that his subsequent arrest and confession to the police were the fruit of that unlawful disclosure. He also contends that his confession should have been suppressed as involuntary. We granted his application for direct appellate review. For the following reasons, we affirm the conviction.

1. *Facts.* Testimony presented at the evidentiary hearing on the defendant's motion to suppress reveals the following facts.[1]

On May 11, 1998, a masked gunman robbed the Security Federal Savings Bank at the Falmouth Mall. The following day, the defendant contacted a clinic in Harvard seeking an emergency appointment with Cathy Lindbeck, a psychiatric nurse who had been involved with the defendant's therapy for a period of one or two years.[2] An appointment was set for that afternoon.

The defendant arrived at 1 P.M., an hour early, and was visibly agitated while waiting to see Lindbeck. At approximately 2 P.M., the defendant met with Lindbeck alone in her office for the scheduled appointment. The defendant still appeared "agitated" and "very upset." He told Lindbeck that he had "done something very stupid" and that he did not want to "go to jail." He handed Lindbeck an envelope and told her to give it to his daughter. He then said that he had overdosed on his medications. By that point, Lindbeck was of the opinion that the defendant was suicidal, and she was concerned that his reporting of the amount of his overdose might not be reliable. She told the

---

[1]The motion judge did not make findings of fact but merely denied the defendant's motion to suppress after an evidentiary hearing. "The judge's denial of the defendant's motion implies resolution of factual issues in favor of the Commonwealth, although once again we urge trial judges to make written findings." *Commonwealth* v. *Lanoue*, 392 Mass. 583, 586 n.2 (1984), *S.C.*, 400 Mass. 1007 (1987), and 409 Mass. 1 (1990). Here, the relevant sequence of events leading up to the nurse's disclosures to the police and the defendant's subsequent confession was essentially undisputed.

[2]The defendant previously lived in Pepperell and Townsend, during which time he had been treated at the clinic in Harvard. He moved to his parents' house in Mashpee just three months prior to the robbery.

defendant that she wanted to telephone for an ambulance. The defendant protested that he did not want the police contacted. He went on to tell her that he had robbed a bank, and that he had been burned when "the money exploded." He lifted his shirt to show her the burn marks on his stomach.

Deferring to the defendant's request that she not dial 911, Lindbeck instead called the defendant's insurer to arrange for an ambulance to take the defendant to a hospital. While Lindbeck was on the telephone to the insurance company, the defendant blurted out that he had a gun. Lindbeck was "totally petrified," and asked the defendant to give her the gun. As the defendant took out a gun, Lindbeck asked him if it was loaded, to which the defendant responded that it was. She asked him to unload it. The defendant complied. Lindbeck then placed the gun in one drawer and the bullets in another drawer. In connection with his handing over the gun, the defendant again stated that he did not want to go to jail and asked Lindbeck not to tell anyone.[3]

After confirming that an ambulance was being sent, Lindbeck suggested to the defendant that they go out to secure his automobile, as it would be left at the clinic while he went to a hospital.[4] The defendant agreed, and they both went out to the parking lot. Meanwhile, the defendant's former girl friend, Sheri Whittemore, had arrived. The defendant, still agitated, began conversing with Whittemore in the parking lot. Lindbeck remained outside watching the defendant, awaiting the arrival of the ambulance.

Although Lindbeck had not contacted the police, the ambulance company had notified the Harvard police that an ambulance was en route to the clinic to attend to a suspected drug overdose. It was standard practice for the Harvard police to dispatch an officer to provide assistance for any such reported medical emergency, and, pursuant to that practice, Officer Marybeth Hebert had been dispatched to the clinic. She arrived there

---

[3]The gun the defendant gave to Lindbeck was not the weapon used during the robbery. According to the defendant's later statement, he had robbed the bank using "a fake gun" and had discarded it while fleeing the scene.

[4]She characterized this suggestion as an excuse to get the defendant out of her office.

shortly before the ambulance. At the time of her arrival, Hebert had no knowledge of any crime. Her purpose in going to the clinic was solely to offer assistance to ambulance personnel dealing with what had been reported as a possible drug overdose.

When Hebert arrived, Lindbeck immediately pointed out the defendant as the person who had overdosed. Lindbeck also told Hebert that the defendant had brought a gun to the clinic, and that she had locked the gun in her office. Hebert went over to the defendant and asked him if he had any weapons. He said that he did not. Hebert pat frisked him and found no weapons. She observed that he was upset and distraught, and the defendant told Hebert that he had "done a stupid thing" (which she assumed referred to the drug overdose). The ambulance arrived shortly thereafter, and the medical personnel attended to the defendant and took him to Emerson Hospital.

Hebert remained behind at the clinic and spoke to Whittemore, the defendant's former girl friend. Whittemore expressed concern that the defendant had many weapons, and mentioned that he carried a small gun in his pocket. She also reported to Hebert that the defendant had told her he had robbed a bank on Cape Cod. Until that statement from Whittemore, Hebert had been unaware of the defendant's involvement in any robbery. Hebert contacted the dispatch officer to check whether the defendant was licensed to carry a firearm and learned that he was not.

Hebert then went into the clinic to speak further with Lindbeck. Lindbeck turned over the defendant's gun and ammunition, and provided Hebert with more detail concerning the defendant's visit — that the defendant had arrived in a distraught and suicidal state, that he had had a gun, that he had turned over the gun on request, that he had admitted to robbing a bank, and that he had been burned when the stolen money had "exploded."

Based on the information concerning the gun, the Harvard police sent an officer to Emerson Hospital to arrest the defendant on firearms charges. The defendant remained at the hospital overnight, with an officer on duty keeping watch. Meanwhile,

the Harvard police notified the authorities on Cape Cod that the defendant was claiming involvement in a bank robbery.

When the defendant was discharged from the hospital the next day, he was taken to the Harvard police station for booking on the firearms charge. Miranda rights were read to him as part of the booking procedure, and the booking officer advised the defendant that some officers from the Falmouth police department were coming to speak to him about an incident in Falmouth. The defendant expressed concern about "going to jail" and said that he wanted "help." He appeared "worried" and "anxious." The officer told the defendant that if he knew "the difference between right and wrong," his recommendation was that the defendant be "forthright and come forward, speak with these officers and kind of clear a slate for him." The officer, who had little (if any) information about the bank robbery in Falmouth, did not question the defendant about the incident.

Approximately one and one-half hours later, the defendant was taken to the Clinton Division of the District Court Department to be arraigned on the weapons charge. While at the court house, two officers from Falmouth, accompanied by a State trooper, arrived. Before questioning the defendant, the Falmouth officers readvised him of his Miranda rights, giving him a written copy of the warnings so he could read along while the officer recited them. The defendant then signed the form and agreed to speak with the officers. Although the defendant still appeared "emotionally distraught" and "tired," he was coherent, articulate, and did not appear to be under the influence of alcohol or drugs.[5] He proceeded to give the officers a detailed narrative of his perpetration of the bank robbery and its aftermath, explaining that he had been extremely depressed and intoxicated at the time and that he had committed the robbery in the hope that the police would shoot him. On being returned to a holding cell at the completion of the interview, the defendant was weeping. He asked to see the officer from Harvard. The defendant said to the officer, "I did the right thing and told them about it."

---

[5] He had been under observation in the hospital since the previous afternoon, and then had been discharged to police custody that morning. As of the time he was being questioned, he had not had access to drugs or alcohol for almost twenty-four hours.

2. *Suppression as fruit of the poisonous tree.* The defendant argues that his confession should have been suppressed as the fruit of Lindbeck's wrongful disclosure of confidential communications. He contends that Lindbeck's revelations to Officer Hebert (concerning both the gun and the bank robbery) were prohibited by G. L. c. 233, § 20B, as the circumstances surrounding those disclosures did not meet the requirements of the dangerous patient exception set forth in § 20B (*a*). He then argues that his arrest on firearms charges and the interrogation about the robbery were the fruit of those wrongful disclosures such that the confession should have been suppressed as fruit of the poisonous tree. We assume, without deciding, that at least some portions of Lindbeck's disclosures were in violation of her obligation to keep patient information confidential, but we do not agree that any such violation would require suppression of the defendant's confession.

In their briefs and at oral argument, both sides assumed that G. L. c. 233, § 20B, generally prohibits disclosures by psychotherapists[6] and focused their arguments on whether the exception set forth in § 20B (*a*) justified the disclosures made by Lindbeck. That assumption does not comport with the actual wording of § 20B. The relevant prohibition set forth in the statute is as follows: "[I]n any court proceeding and in any proceeding preliminary thereto and in legislative and administrative proceedings, a patient shall have the privilege of refusing to disclose, and of preventing a witness from disclosing, any communication, wherever made, between said patient and a psychotherapist relative to the diagnosis or treatment of the patient's mental or emotional condition." As worded, § 20B creates an evidentiary privilege applicable to various "proceedings." It does not mandate confidentiality, or prohibit disclosure, in other settings.[7] While it may seem anomalous to place greater confidentiality requirements on other mental health

[6]The term "psychotherapist" includes a registered nurse who has been authorized to practice as a "psychiatric nurse mental health clinical specialist." G. L. c. 233, § 20B. See G. L. c. 112, § 80B. Under that definition, Lindbeck qualifies as a "psychotherapist."

[7]By comparison, statutes governing other mental health professionals mandate that communications be kept "confidential" in all circumstances, sometimes setting forth a separate evidentiary privilege. See, e.g., G. L.

professionals (see note 7, *supra*) than on psychotherapists, the unambiguous wording of § 20B specifies that it only grants an evidentiary privilege within the course of a "proceeding." At the time of Lindbeck's disclosure of information to Officer Hebert, there was no "proceeding" pending, and the disclosure was not made "in" any such "proceeding." G. L. c. 233, § 20B. Regardless of whether some or all of the disclosures made by Lindbeck would be justified by the exception set forth in § 20B (*a*), there is nothing in § 20B itself that prohibited Lindbeck from making such disclosures.

We do recognize, however, that a requirement of confidentiality was placed on Lindbeck as a matter of professional ethics. See Codes of Professional Responsibility 498 (Gorlin 4th ed. 1999) (nurse must "safeguard[] the client's right to privacy by judiciously protecting information of a confidential nature," but duty of confidentiality "is not absolute when innocent parties are in direct jeopardy"). See also *id.* at 456 ("psychiatrist may release confidential information only with the authorization of the patient or under proper legal compulsion"); *Sugarman* v. *Board of Registration in Medicine*, 422 Mass. 338, 343-344 (1996) (disciplinary sanctions imposed on psychiatrist by board of registration in medicine for violating ethical obligation of confidentiality). Patient confidentiality "is a cardinal rule of the medical profession, faithfully adhered to in most instances, and thus has come to be justifiably relied upon by patients seeking advice and treatment." *Alberts* v. *Devine*, 395 Mass. 59, 66,

c. 233, § 20J ("sexual assault counsellor shall not disclose such confidential communication, without the prior written consent of the victim" and "[s]uch confidential communications shall not be subject to discovery and shall be inadmissible in any criminal or civil proceeding without the prior written consent of the victim . . ."); G. L. c. 112, § 129A (communications with psychologist are "confidential" and "[n]o psychologist, colleague, agent or employee of any psychologist . . . shall disclose any information acquired or revealed in the course of or in connection with the performance of the psychologist's professional services . . ."); G. L. c. 112, § 135A (same as to social worker); G. L. c. 112, § 172 ("communication between an allied mental health or human services professional and a client shall be deemed confidential"). See also G. L. c. 233, § 20A (clergyman "shall not, without the consent of the person making the confession, be allowed to disclose a confession made to him in his professional character . . . nor shall [such clergyman] testify as to any communication made to him by any person in seeking religious or spiritual advice or comfort").

cert. denied sub nom. *Carroll* v. *Alberts*, 474 U.S. 1013 (1985), quoting *MacDonald* v. *Clinger*, 84 A.D.2d 482, 483 (N.Y. 1982). Disclosure of confidential medical information, in violation of that professional duty, can constitute an actionable tort, or an invasion of privacy actionable under G. L. c. 214, § 1B. See *Tower* v. *Hirschhorn*, 397 Mass. 581, 585-588 (1986); *Alberts* v. *Devine*, *supra* at 65-69. At the evidentiary hearing on the defendant's motion to suppress, Lindbeck acknowledged that the principles of her profession included a requirement that patient communications not be disclosed "unless [she] felt that [the] client was a danger to himself or others." Thus, any improper disclosure to the police by Lindbeck, prior to the commencement of any proceedings and outside the context of any proceedings, must be viewed as a violation of professional ethics, but not as a violation of G. L. c. 233, § 20B.[8]

The defendant contends that the entirety of Lindbeck's disclosures to Officer Hebert violated that obligation of confidentiality. By the time Hebert arrived, the defendant had already turned his weapon over to Lindbeck and was cooperating with her recommendation that he go to a hospital. Thus, he contends, any danger he may have posed when he first came to the clinic had passed. In the absence of any impending threat of harm, he argues, Lindbeck's disclosures about the gun and the robbery were improper.

At a minimum, Lindbeck was entitled to turn the defendant's gun over to the police. She was not required to maintain secret possession of a possibly illegal firearm merely because a patient had handed it to her. Cf. *People* v. *Superior Court*, 192 Cal.

---

[8] At trial, which obviously qualifies as a "proceeding," Lindbeck's testimony concerning the defendant's statements to her was admissible under G. L. c. 233, § 20B (*c*). The defense at trial was lack of criminal responsibility, and the defendant thereby "introduce[d] his mental or emotional condition as an element of his claim or defense." *Id.* The judge's determination that it was "more important to the interests of justice that the communication be disclosed than that the relationship between patient and psychotherapist be protected," *id.*, is amply supported, and the defendant does not argue otherwise. See *Commonwealth* v. *Seabrooks*, 433 Mass. 439, 448-450 (2001) (§ 20B [*c*] exception properly invoked where defense was lack of criminal responsibility and judge made requisite finding on balancing of interests); *Commonwealth* v. *Trapp*, 396 Mass. 202, 212-213 n.10 (1985), *S.C.*, 423 Mass. 356, cert. denied, 519 U.S. 1045 (1996) (same).

App. 3d 32, 35 (1987) (source of and circumstances in which attorney came into possession of weapon from client privileged, but weapon itself not privileged); *State ex rel. Sowers* v. *Olwell*, 64 Wash. 2d 828, 832-834 (1964) (same). For purposes of our analysis, we will assume, without deciding, that Lindbeck's further disclosures concerning the defendant's possession of that gun and his involvement in a robbery were a violation of Lindbeck's professional obligation to keep patient communications confidential.

Assuming that violation, the defendant's contention that his later confession must be suppressed as the fruit of the poisonous tree is unpersuasive. A fundamental flaw in the defendant's fruit of the poisonous tree analysis is that, whatever was wrongful in Lindbeck's disclosures, those disclosures were made by Lindbeck on her own initiative. The record is devoid of anything to suggest that the police did anything to solicit, provoke, or tempt Lindbeck into making her disclosures, and thus devoid of anything suggesting police misconduct. Hebert came to the scene to assist ambulance personnel with a reported medical emergency unrelated to any criminal activity. On her arrival, both Lindbeck and Whittemore volunteered information concerning the defendant's involvement in criminal activity. Nothing in our law prevented Hebert from acting on that information. That a private party may have breached some obligation of confidentiality in volunteering information to the police does not require the police to ignore that information.[9]

The defendant cites no authority for the proposition that a private party's breach of some obligation, unconnected with any form of police misconduct, can serve to launch a fruit of the poisonous tree analysis.[10] Rather, the "target" of the exclusionary rule "is official misconduct," and the rule is not intended

---

[9]Indeed, the police often will not be in a position to determine whether there was any such breach. Here, for example, Hebert had no way of knowing whether the defendant had authorized the disclosures. Or, until the disclosures had already been made, Hebert would have no way of assessing whether the dangers of the situation were such that the disclosures would be justified without the patient's consent.

[10]Coercion applied by a private party may render a defendant's confession to that private party involuntary, requiring that the confession be suppressed as violative of due process. See *Commonwealth* v. *Mahnke*, 368 Mass. 662, 680-681 (1975), cert. denied, 425 U.S. 959 (1976). The defendant has not

"to discourage citizens from aiding to the utmost of their ability in the apprehension of criminals." *Coolidge* v. *New Hampshire,* 403 U.S. 443, 488 (1971). See *Stone* v. *Powell,* 428 U.S. 465, 484, 486 (1976) (purpose of exclusionary rule is to "deter future unlawful police conduct," not to "redress the injury to the privacy of the victim of the search or seizure").

Whether private parties are turning over to the police physical evidence that they have uncovered or, as here, turning over information they have acquired, the result is the same, as the exclusionary rule does not exclude evidence obtained by way of purely private conduct or misconduct. "Evidence discovered and seized by private parties is admissible without regard to the methods used, unless State officials have instigated or participated in the search." *Commonwealth* v. *Leone,* 386 Mass. 329, 333 (1982). See *District Attorney for the Plymouth Dist.* v. *Coffey,* 386 Mass. 218, 221 (1982) ("evidence illegally obtained by private parties and turned over to the police is not a violation of the Fourth Amendment [to the United States Constitution]"); *Commonwealth* v. *Richmond,* 379 Mass. 557, 561-562 & n.2 (1980) (mother intercepted defendant's incriminating letter to her daughter and turned letter over to police; suppression not required even if interception were held unlawful); *Commonwealth* v. *McCambridge,* 44 Mass. App. Ct. 285, 289 (1998) (no violation of State or Federal Constitution "when evidence is seized by private parties who are not acting as agents of the police and subsequently turned over to the police"); *Commonwealth* v. *Storella,* 6 Mass. App. Ct. 310, 313 (1978) (same).

Thus, we have undertaken a fruit of the poisonous tree analysis only in cases alleging some form of underlying police or other official misconduct. See, e.g., *Commonwealth* v. *Straw,* 422 Mass. 756, 762 (1996) (defendant's confession suppressed as fruit of unlawful police search); *Commonwealth* v. *Fredette,* 396 Mass. 455, 458-463 (1985) (although police unlawfully arrested defendant, fruit of poisonous tree analysis did not lead to suppression of fingerprint evidence because connection between unlawful arrest and acquisition of fingerprints was too attenu-

---

argued, nor is there any evidence, that Lindbeck did anything to coerce any statement from him. He raises no issue of the voluntariness of his statements to Lindbeck.

ated); *Commonwealth* v. *Glavin*, 354 Mass. 69, 71-72 (1968) (fruit of poisonous tree analysis applied to alleged illegal police wiretap). However, unless there is either police misconduct, or police instigation of misconduct by a private party, there is no "poisonous tree" that can taint subsequent police investigation. Lindbeck's unprompted disclosures of patient confidences were not the product of any form of police misconduct and therefore would not require suppression of any evidence that the police obtained as a result of those disclosures.[11]

3. *Voluntariness of confession.* The defendant contends that his distraught emotional state, combined with the officer's recommendation that he be "forthright" and "clear a slate," rendered his confession involuntary. Implicit in the judge's denial of the defendant's motion to suppress is a finding that the confession was voluntary (see note 1, *supra*). That implicit finding is supported by the evidence. While the defendant was still upset when he spoke to the officers, he was coherent, lucid, and articulate. He did not appear to be under the influence of alcohol or drugs. As for another officer's recommendation (made some two hours earlier, well before interrogating officers' reiterating Miranda warnings) that the defendant be "forthright" and "clear a slate," we see no meaningful distinction between that recom-

---

[11]Although not necessary to our conclusion, we also note that there was no causal connection between Lindbeck's disclosures and the defendant's later confession. In sequence, Hebert first learned of the defendant's involvement in a Cape Cod bank robbery from Whittemore, not from Lindbeck. The contents of Lindbeck's disclosures on that subject were purely cumulative of what Whittemore had already told Hebert, and Hebert learned no additional detail about the robbery from Lindbeck's disclosure of patient confidences. As such, Lindbeck's disclosures did not set in motion any chain of events that led to the Falmouth investigators' interest in the defendant as a possible suspect, nor did Lindbeck's disclosures in any way cause the defendant to confess to the robbery. As to the gun, it is true that Lindbeck's disclosure on that subject was what first alerted Hebert to the defendant's possession of a weapon. However, when Hebert spoke to Whittemore, Whittemore volunteered the information that the defendant possessed many guns, including a handgun that he ordinarily carried in his pocket. The defendant speculates that Hebert only spoke to Whittemore because of Lindbeck's information about the defendant's gun, but such speculation cannot form the basis of a fruit of the poisonous tree analysis. Rather, as with the information about the bank robbery, information about the defendant's possession of weapons came from sources independent of Lindbeck, and Lindbeck's disclosures on that subject had no bearing on the defendant's confession to an unrelated bank robbery.

mendation and the kind of remarks that we have found unobjectionable in other cases. See *Commonwealth* v. *Souza*, 428 Mass. 478, 481-482 n.3 (1998) (interrogating officers advised defendant that it was in his "best interest to deal with [them] at this point, to set the record straight in regards to what happened"); *Commonwealth* v. *Raymond*, 424 Mass. 382, 395-396 (1997) (officer suggested that defendant should tell "his side of the story"). "An officer may suggest broadly that it would be 'better' for a suspect to tell the truth," as long as there is no "assurance, express or implied, that it will aid the defense or result in a lesser sentence." *Commonwealth* v. *Meehan*, 377 Mass. 552, 564 (1979), cert. dismissed, 445 U.S. 39 (1980). The recommendation at issue here was no more than a general admonition that the defendant tell the truth, and was devoid of any implication that doing so would result in more lenient treatment. As such, the officer's remark did not prevent the Commonwealth from satisfying its burden of proving voluntariness beyond a reasonable doubt.

*Judgment affirmed.*