COMMONWEALTH *vs.* PHILLIP M. DAMIANO.

Plymouth. February 8, 2005. - June 3, 2005.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Eavesdropping. Controlled Substances. Constitutional Law,* Search and seizure, Admissions and confessions. *Practice, Criminal,* Admissions and confessions. *Evidence,* Admissions and confessions, Voluntariness of statement.

This court concluded that the exclusionary provision of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2515, which prohibits the admission in evidence of unlawfully intercepted "wire" or "oral" communications, applies to the interception of conversations over both cellular and cordless telephones, and evidence derived therefrom [447-449]; further, this court declined, based on the plain language and legislative history of the statute, to apply a "clean hands" exception to the provision so as to permit the introduction in evidence of an unlawfully intercepted communication where a third party (e.g., a private citizen), and not the government, is the interceptor of the communication [449-451]; therefore, in the absence of any other statutory provision permitting the use of such evidence, a Superior Court judge correctly granted a criminal defendant's motion to suppress the contents of an illegally intercepted communication and certain evidence derived therefrom (i.e., marijuana found in a search of the defendant's person at the time of his arrest, probable cause for which was based on information contained in the intercepted communication) [451-452], but the judge erred in suppressing certain evidence (i.e., evidence obtained voluntarily from the defendant after he was transported to the police station, and after he waived his Miranda rights) the discovery of which was sufficiently attenuated from the intercepted communication to dissipate the taint of its illegality [452-459].

INDICTMENTS found and returned in the Superior Court Department on June 4, 2001.

A pretrial motion to suppress evidence was heard by *Carol S. Ball,* J.

An application for leave to prosecute an interlocutory appeal was allowed by *Sosman,* J., in the Supreme Judicial Court for the county of Suffolk, and the appeal was reported by her.

*Gail M. McKenna,* Assistant District Attorney, for the Commonwealth.

Commonwealth v. Damiano.

*Jane Larmon White*, Committee for Public Counsel Services, for the defendant.

CORDY, J. The Commonwealth appeals from the allowance of a motion to suppress the contents of a telephone conversation to which Phillip M. Damiano was a party, and evidence derived from that conversation, including a bag of marijuana found in a search of Damiano's pockets at the time of his arrest, a large quantity of cocaine subsequently seized from his house, and statements he made to the police at the police station.[1] The basis on which the motion was allowed was a determination by the motion judge that Damiano's telephone conversation was intercepted in violation of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510 et seq. (Title III).[2] The Commonwealth sought interlocutory relief. A single justice granted leave to appeal and designated the appeal to be heard by this court.[3] See G. L. c. 278, § 28E; Mass.

---

[1]The Commonwealth also appeals from an order denying its motion for reconsideration of the suppression order.

[2]Damiano's attempt to obtain relief under the Massachusetts wiretap statute, G. L. c. 272, § 99, was rejected by the judge who, relying on *Commonwealth v. Santoro*, 406 Mass. 421, 423 (1990), declined to suppress the telephone conversation because it was intercepted by a private individual, rather than the government. In light of our conclusion with respect to the application of 18 U.S.C. §§ 2510 et seq. (Title III), we do not reach the State law question.

[3]Damiano argues that the Commonwealth's interlocutory appeal should be dismissed without review of the merits because the appeal is procedurally defective. Specifically, he contends that the Commonwealth failed to file a timely notice of appeal and, instead, filed an untimely motion for reconsideration of the suppression order.

Having reviewed the procedural history of this case, we conclude that Damiano's claim is without merit. The motion judge's initial order suppressing the evidence was entered on March 6, 2003. On April 14, the Commonwealth filed a motion for reconsideration, which was denied on May 19. On May 22, 2003, the Commonwealth filed a notice of appeal under Mass. R. Crim. P. 15, as appearing in 422 Mass. 1501 (1996), and Mass. R. A. P. 3, as amended, 430 Mass. 1602 (1999). The Commonwealth filed its application for interlocutory appeal with a single justice of this court on May 27. Damiano contends that the Commonwealth's motion for reconsideration should have been filed within the time period allowed for the filing of a notice of appeal. Rule 4 (b) of the Massachusetts Rules of Appellate Procedure, as amended, 431 Mass. 1601 (2000), requires that notices of appeal be filed within thirty days. It is within the judge's discretion, however, to reconsider interlocutory orders during the pendency of a case. See *Commonwealth v. Haskell*, 438 Mass. 790, 793 (2003); *Commonwealth v. Downs*, 31 Mass. App. Ct. 467, 469

R. Crim. P. 15 (a) (2), as appearing in 422 Mass. 1501 (1996). For the following reasons, we affirm the judge's suppression order in part and reverse in part.

1. *Facts.* We recite the facts as found by the judge, supplemented by uncontested testimony from the motion hearing. See *Commonwealth* v. *Watson,* 430 Mass. 725, 726 n.5 (2000). On the afternoon of January 27, 2001, a private citizen was listening to a store-bought police scanner in her Wareham home when she intercepted a telephone conversation. Although it was possible to change to a different frequency, she decided to listen to the remainder of the conversation, during which two unidentified men agreed to meet at Vel's Restaurant in Wareham. At one point during the conversation, she heard one of the men, apparently Damiano, say "it all depends on how hungry you are." The other man, later identified as Peter Morrison, told Damiano that he would be driving a black Mercury Cougar motor vehicle. It was subsequently determined that Morrison had initiated the call using a cordless telephone, and that Damiano had received it on a cellular telephone.

The listener inferred from the conversation that the two men were meeting to complete a drug transaction, and contacted the Wareham police. A police dispatcher conveyed the information to two Wareham police officers who drove their unmarked vehicle to Vel's Restaurant and parked in a lot across the street. A couple of minutes later, a black Mercury Cougar automobile pulled into the restaurant's parking lot. The police observed Damiano leave a nearby house, cross the highway, and approach the driver's side of Morrison's vehicle. Damiano either handed something to or took something from Morrison and entered the passenger side of the vehicle. Morrison pulled out of the parking lot, headed north on the highway, and made a left turn into the parking lot in which the police officers were parked. Three marked cruisers then proceeded to pull the vehicle over. Damiano was ordered out of the car and searched. A bag of marijuana was found in his pocket and he was placed under

(1991), citing *Commonwealth* v. *Cronk,* 396 Mass. 194, 196-197 (1985) ("As to interlocutory orders which are not dispositive of a case, reconsideration may be sought within a reasonable time during the pendency of the case before the trial court").

arrest. An officer at the scene noticed a child watching from the window of the house from which Damiano had come. Consequently, police were sent to secure the premises until a search warrant could be obtained. Damiano's wife and child were found on the premises.

Damiano was taken to the police station and twice advised of his Miranda rights. He was also informed that the police intended to obtain a warrant to search his house. There was no evidence that he was informed of the intercepted telephone conversation.[4] Upset that the police were posted at his house (with his wife and child), and in order to hasten their departure, Damiano eventually told the officers that he kept a small amount of marijuana in a nightstand in his bedroom. He also signed a written consent form, permitting the police to search the house. With the assistance of a police dog, the police discovered a large stash of cocaine hidden behind a locked door off the kitchen.

2. *Discussion.* In 1968, largely in response to the United States Supreme Court's holdings in *Berger* v. *New York*, 388 U.S. 41 (1967), and *Katz* v. *United States*, 389 U.S. 347 (1967), Congress enacted Title III. *Bartnicki* v. *Vopper*, 532 U.S. 514, 522-523 (2001). One of its stated purposes was to "protect[] the privacy of wire and oral communications." Pub. L. 90-351, 90th Cong., 2d Sess., reprinted in 1968 U.S.C.C.A.N. 2153. To further this purpose, Title III makes it a crime, except in limited circumstances, to intentionally intercept a "wire," "oral," or "electronic communication," or to intentionally disclose the contents of such a communication.[5] See 18 U.S.C. § 2511. Title III also prohibits the admission in evidence of unlawfully

---

[4]The only evidence on this point was the testimony of a Wareham police officer that he did not recall that Damiano was told about the overheard telephone conversation between him and Morrison.

[5]The Commonwealth argues that the interception here was not intentional, and thus not unlawful. In 1986, Congress amended 18 U.S.C. § 2511, to change the requisite state of mind from "willful" to "intentional." Insight into what Congress meant when it used the term "intentional" can be found in the amendment's legislative history:

"As used in the Electronic Communications Privacy Act, the term 'intentional' is narrower than the dictionary definition of 'intentional.' 'Intentional' means more than that one voluntarily engaged in conduct

intercepted "wire" or "oral" (but not "electronic") communications, and evidence derived therefrom. Specifically, § 2515 provides:

> "Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the United States, a State, or a political subdivision thereof if the disclosure of that information would be in violation of this chapter."[6]

---

or caused a result. Such conduct or the causing of the result must have been the person's conscious objective. An 'intentional' state of mind means that one's state of mind is intentional as to one's conduct or the result of one's conduct if such conduct or result is one's conscious objective. The intentional state of mind is applicable only to conduct and results. Since one has no control over the existence of circumstances, one cannot 'intend' them."

Pub. L. 99-508, 99th Cong., 2d Sess., reprinted in 1986 U.S.C.C.A.N. 3577. We agree with the motion judge that the private citizen's conduct satisfies the state of mind requirement in § 2515. At the motion hearing, the citizen testified that she knew how to "scan away" from personal telephone calls intercepted by her police scanner and that she had done so in the past. When she heard the conversation between Morrison and Damiano, however, she did not hit the scan button. Instead, she listened to the remainder of the conversation, which she estimated to be five minutes long. It is therefore apparent that the interception was her "conscious objective" and not "the product of inadvertence or mistake." In re Pharmatrak, Inc., 329 F.3d 9, 23 (1st Cir. 2003).

[6]A "wire communication" is defined as "any aural transfer made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception (including the use of such connection in a switching station) furnished or operated by any person engaged in providing or operating such facilities for the transmission of interstate or foreign communications or communications affecting interstate or foreign commerce." 18 U.S.C. § 2510(1), as amended by Pub. L. 107-56, Title II, § 209(1)(A), 115 Stat. 283 (2001).

An "oral communication" is defined as "any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation, but such term does not include any electronic communication." 18 U.S.C. § 2510(2), as amended by Pub. L. 99-508, Title I, § 101(a)(2), 100 Stat. 1848 (1986).

The Commonwealth contends that the telephone conversation between Morrison and Damiano constituted an "electronic communication," not a "wire" or "oral" communication, and as such, the suppression remedy provided in § 2515 is inapplicable to this case.[7] Specifically, it maintains that a "signal broadcast by a portable or cordless telephone is a radio signal and, therefore, an electronic communication." The Federal cases relied on by the Commonwealth to support this contention, however, involve interceptions that took place before Congress amended Title III in 1994 to ensure that communications taking place on cordless telephones were included within the definition of "wire communication."[8] See, e.g., *Price* v. *Turner*, 260 F.3d 1144, 1147 (9th Cir. 2001) (Title III "did not protect cordless phone conversations that took place before the statutory amendment in 1994," but "none of the intercepted conversations" at issue "took place after 1993"). It is clear that the exclusionary provision of Title III "now applies to the interception of conversations over both cellular and cordless phones." *Bartnicki* v. *Vopper, supra* at 524.

The Commonwealth next urges us to apply a "clean hands" exception to § 2525, so as to permit the introduction in evidence

---

[7]An "electronic communication" is defined in relevant part as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce, but does not include . . . any wire or oral communication." 18 U.S.C. § 2510(12), as amended by Pub. L. 104-132, Title VII, § 731(1), 110 Stat. 1303 (1996).

[8]The Electronic Communications Privacy Act of 1986 amended Title III by excluding from the definition of wire communication the "radio portion of a cordless telephone communication that is transmitted between the cordless telephone handset and the base unit." See 18 U.S.C. § 2510(1), as amended by Pub. L. 99-508, 99th Cong., 2d Sess., reprinted in 1986 U.S.C.C.A.N. 3566. The Communications Assistance for Law Enforcement Act of 1994 deleted this exception for cordless telephones. See 18 U.S.C. § 2510(1), as amended by Pub. L. 103-414, 103d Cong., 2d Sess., reprinted in 1994 U.S.C. C.A.N. 3489, 3497. The 1994 amendments were intended in part to address privacy concerns in the wake of changes in telecommunication technologies and practices. A 1991 congressional task force found that the "cordless phone, far from being a novelty item used only at 'poolside,' has become ubiquitous . . . . More and more communications are being carried out by people [using cordless phones] in private, in their homes and offices, with an expectation that such calls are just like any other phone call." Pub. L. 103-414, 103d Cong., 2d Sess., reprinted in 1994 U.S.C.C.A.N. 3497.

of any unlawfully intercepted wire or oral communication where, as here, the police are only the recipients and not the interceptors of the communication. There is some disagreement among the Circuit Courts of the United States Court of Appeals as to whether communications unlawfully intercepted by private citizens must be suppressed as evidence when there has been no government involvement. Compare *United States* v. *Vest*, 813 F.2d 477, 481 (1st Cir. 1987) ("allow[ing] the government's use of unlawfully intercepted communications where the government was not the procurer 'would eviscerate the statutory protection of privacy from intrusion by illegal private interception' "), with *United States* v. *Murdock*, 63 F.3d 1391, 1403 (6th Cir. 1995), cert. denied, 517 U.S. 1187 (1996) ("nothing in the legislative history [of Title III] . . . requires that the government be precluded from using evidence that literally falls into its hands"). However, the majority of courts that have ruled on the "clean hands" exception have rejected it. See *Berry* v. *Funk*, 146 F.3d 1003, 1012-1013 (D.C. Cir. 1998); *Chandler* v. *United States Army*, 125 F.3d 1296, 1302 (9th Cir. 1997); *In re Grand Jury*, 111 F.3d 1066, 1077-1079 (3d Cir. 1997). We agree with the judge that government involvement in the unlawful interception of a wire or oral communication is not required to trigger Title III's exclusionary rule.

The plain language of § 2515 mandates the suppression of any intercepted wire or oral communication and any "evidence derived" from that communication "if the disclosure of that information would be in violation of" Title III. 18 U.S.C. § 2515. "Section 2511(1)(c) is also unambiguous, making it a crime whenever one 'intentionally discloses, or endeavors to disclose, to any person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection.' " *In re Grand Jury, supra* at 1077 (rejecting "clean hands" exception to 18 U.S.C. § 2515). Nothing in the literal language of the statute indicates that Title III permits the government, in cases such as this, to disclose the contents of an illegally intercepted wire or oral communication when the govern-

ment was not the unlawful interceptor of that communication.[9] Title III's "evidentiary prohibition must be applied to perpetrators and non-perpetrators alike." *Id.* at 1078.

The legislative history of Title III also supports a literal interpretation of § 2515. The basic purpose of the statute "is to 'protec[t] the privacy of wire . . . and oral communications.' " *Bartnicki* v. *Vopper, supra* at 526, quoting S. Rep. No. 1097, 90th Cong., 2d Sess. 66 (1968). Title III "prevent[s] private, not just governmental, wiretapping." *Chandler* v. *United States Army, supra* at 1302 (rejecting "clean hands" exception to 18 U.S.C. § 2515). See *United States* v. *Vest, supra* at 481 ("protection of privacy from invasion by illegal private interception as well as unauthorized governmental interception plainly 'play[s] a central role in the statutory scheme' "). As one member of Congress stated, in connection with the 1986 amendments to Title III, the statute protects private communications from "a corporate spy, a police officer without probable cause, or just a plain snoop." 131 Cong. Rec. 24366 (1985) (statement of Sen. Leahy). An unlawful invasion of privacy by a private citizen "is compounded by disclosure in court or elsewhere." *United States* v. *Vest, supra.* "The impact of this second invasion is not lessened by the circumstance that the disclosing party (here, the government) is merely the innocent recipient of a communication illegally intercepted . . . ." *Id.* As such, we decline to read into § 2515 a "clean hands" exception that Congress itself did not see fit to write into the statute.

We are similarly unpersuaded that the "investigation or law enforcement" provisions of 18 U.S.C. § 2517 authorize the use of the intercepted telephone call in this case. Section 2517(1) and (2) provides that "[a]ny investigative or law enforcement officer who, by any means authorized by this chapter, has

---

[9]An exception to the exclusionary rule of § 2515 has been made in cases where evidence of unlawfully intercepted communications has been admitted in evidence against the interceptor in criminal prosecutions for Title III violations. See *United States* v. *Liddy,* 354 F. Supp. 217, 221 (D.D.C. 1973), aff'd, 509 F.2d 428 (D.C. Cir. 1974), cert. denied, 420 U.S. 911 (1975). See also S. Rep. No. 1097, 90th Cong., 2d Sess. (1968), reprinted in 1968 U.S.C. C.A.N. 2188 ("in certain limited situations disclosure and use of illegally intercepted communications would be appropriate to the proper performance of the officers' duties. For example, such use and disclosure would be necessary in the investigation and prosecution of an illegal wiretapper himself").

obtained knowledge of the contents of" intercepted communications may disclose or use those contents when "appropriate to the proper performance of . . . official duties."[10] The Commonwealth contends that the police went to Vel's Restaurant to corroborate the reported content of the intercepted communication, and that this activity constituted the "performance" of "official duties" because the officers were investigating an alleged violation of Title III. We need not decide whether, if this were the case, the exception in § 2517 would apply, because there is no evidence in the record to support this claim.[11] Accordingly, the judge correctly ruled that the contents of the intercepted communication and "evidence derived therefrom" must be suppressed.

The Commonwealth next argues that the evidence seized from Damiano's home is not evidence "derived" from the illegal interception because its discovery was sufficiently attenuated from that interception to dissipate the taint of its illegality. See *Brown* v. *Illinois*, 422 U.S. 590, 609 (1975) (Powell, J.,

---

[10]Subsection 1 of 18 U.S.C. § 2517 provides:

> "Any investigative or law enforcement officer who, by any means authorized by this chapter, has obtained knowledge of the contents of any wire, oral, or electronic communication, or evidence derived therefrom, may disclose such contents to another investigative or law enforcement officer to the extent that such disclosure is appropriate to the proper performance of the official duties of the officer making or receiving the disclosure."

Subsection 2 of 18 U.S.C. § 2517 provides:

> "Any investigative or law enforcement officer who, by any means authorized by this chapter, has obtained knowledge of the contents of any wire, oral, or electronic communication or evidence derived therefrom may use such contents to the extent such use is appropriate to the proper performance of his official duties."

[11]The Commonwealth's reliance on *Forsyth* v. *Barr*, 19 F.3d 1527 (5th Cir. 1994), cert. denied, 513 U.S. 871 (1994), is misplaced. There, the court ruled that a "police department internal affairs division's disclosure or use of [intercepted communications], furnished by a third party, to conduct a *preliminary investigation in a non-adversarial context* is not a violation of § 2515" (emphasis added). *Id.* at 1541. This holding is inapposite; here, the Commonwealth is attempting to introduce evidence of an intercepted communication and evidence derived from its use, in a criminal prosecution, conduct that is expressly proscribed in § 2515.

concurring in part) ("The notion of the 'dissipation of the taint' attempts to make the point at which the detrimental consequences of illegal police action become so attenuated that the deterrent effect of the exclusionary rule no longer justifies its cost"). It makes a similar claim with respect to statements Damiano made at the police station after waiving his Miranda rights. While a close case, on this point we agree.[12]

In using the language "no evidence derived therefrom" in § 2515, "Congress expressly adopted a 'the fruit of the poisonous tree' doctrine for wiretap evidence," *Chandler* v. *United States Army, supra* at 1304, and with it the correlative attenuation rule. See S. Rep. No. 1097, 90th Cong., 2d Sess. (1968), reprinted in 1968 U.S.C.C.A.N. 2185 (§ 2515 "applies to suppress evidence directly . . . or indirectly obtained in violation of the chapter. . . . There is, however, no intention to change the attenuation rule"). Consequently, we look to our constitutional jurisprudence to guide our analysis regarding the application of that rule.

The "fruit of the poisonous tree" doctrine as articulated in *Wong Sun* v. *United States*, 371 U.S. 471, 487-488 (1963), has been applied to evidence derived from violations of both the Fourth and Fifth Amendments to the United States Constitution. *Commonwealth* v. *Perrot*, 407 Mass. 539, 546-548 (1990) (pocketbook from burglary seized as result of statement illegally obtained from defendant suppressed); *Commonwealth* v. *Pietrass*, 392 Mass. 892, 900-901 (1984) (clothing seized from defendant after unlawful warrantless entry and search suppressed). In determining whether evidence obtained after such a violation must be suppressed, the issue is not whether "but for" the prior illegality the evidence would not have been obtained, but "whether . . . the evidence . . . has been come at by exploitation of [that] illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Commonwealth* v. *Bradshaw*, 385 Mass. 244, 258 (1982), quoting *Wong Sun* v. *United States, supra* at 488. "[I]nfection will be held to have occurred when the illegality of the police behavior is sufficiently grave and the connection between the il-

---

[12]The Commonwealth makes the same claim with respect to the marijuana seized at the time of Damiano's arrest. We reject this claim. See *infra*.

legality and the making of the statements is sufficiently intimate." *Commonwealth* v. *Sylvia*, 380 Mass. 180, 183 (1980), quoting *Commonwealth* v. *Fielding*, 371 Mass. 97, 113 (1976). In this sense, the attenuation rule is "not an exception to the exclusionary rule but a test of its limits." R.G. Stearns, Massachusetts Criminal Law: A District Court Prosecutor's Guide 120 (23d ed. 2003).[13]

It is the Commonwealth's burden to establish that the evidence it has obtained and intends to use is sufficiently attenuated from the underlying illegality so as to be purged from its taint. *Commonwealth* v. *Fredette*, 396 Mass. 455, 459 (1985), citing *Commonwealth* v. *Cote*, 386 Mass. 354, 362 (1982). The underlying illegality in this case is the unlawful interception of a wire communication by a private party in violation of Title III, not an unlawful arrest.[14] The contents of that communication, once conveyed to the police, were used to justify the stop and arrest of Damiano. As the judge found, without the information contained in the interception, there would not have been probable cause to effectuate the arrest. In this sense, the arrest

---

[13]In her order on the Commonwealth's motion for reconsideration, the judge concluded that all evidence "that flowed" from the unlawful interception constituted "fruit of the poisonous tree." Specifically, she found:

> "Absent the information gleaned from the [citizen's] interception, probable cause to arrest [the defendant] rests upon the observations made by the police in Vel's parking lot. Those observations are insufficient to justify the arrest. All the evidence gathered here flows from the arrest and so must be suppressed."

The judge did not address the Commonwealth's contention that the presence of intervening circumstances dissipated the taint of the unlawful interception.

[14]The arrest itself was not "unlawful." The judge found that the tip received from the private citizen whose knowledge was obtained "through personal observation by overhearing a conversation between the defendant and another individual" regarding an apparent drug transaction, corroborated by police observation through surveillance, satisfied the two-prong test set out in *Commonwealth* v. *Upton*, 394 Mass. 363, 375 (1985). Accordingly, she ruled that police had probable cause to arrest Damiano and any subsequent search was not the product of an "unlawful arrest." We do not disturb this finding. The fact that evidence made inadmissible at a subsequent trial pursuant to 18 U.S.C. § 2515 formed part of the probable cause on which the arrest was based does not alone change the lawful nature of that arrest. The statute itself excludes the use of such evidence only in a "trial, hearing or other proceeding." An arrest is not a trial, hearing, or a proceeding.

was dependent on the underlying interception, and the marijuana seized from Damiano in its course was equally "intimate" to, and dependent on, that underlying illegality. In these circumstances, it cannot be said that the marijuana was secured "by means sufficiently distinguishable" from the illegal interception to be purged of its primary taint.[15] The more difficult question is whether the evidence obtained voluntarily from Damiano after he was transported to the station, and after he waived his Miranda rights, was sufficiently attenuated from that primary illegality.

The Supreme Court has said that whether there has been adequate attenuation in the context of an admission secured following an illegal arrest depends on the facts of each case examined in light of four factors: (1) the temporal proximity of the admission to the arrest; (2) the presence of intervening circumstances between the arrest and the admission; (3) the observance of the Miranda rule subsequent to the unlawful arrest; and (4) the purpose and flagrancy of the official misconduct. *Kaupp* v. *Texas*, 538 U.S. 626, 633 (2003) (per curiam).[16] We look to these factors for guidance, albeit in the context of a different form of illegality, and one not involving the police or other government officials. We examine first, and in conjunction with each other, the temporal proximity of the illegal interception to Damiano's admission (and consent), and the presence of any intervening events. Here, the record is unclear as to precisely how much time elapsed between the illegal interception and the moment when Damiano made admissions and consented to a search of his house, although both occurred on the same day. The record is clear, however, that the

---

[15]If the police had made observations from the parking lot that would have established probable cause independent of the contents of the interception, our conclusion might have been otherwise.

[16]In *Commonwealth* v. *Fredette*, 396 Mass. 455 (1985), we articulated three factors to be considered with respect to attenuation: "the temporal proximity of the arrest to the obtaining of the evidence; the presence of intervening circumstances; and the purpose and flagrancy of the misconduct." *Id.* at 460, citing *Brown* v. *Illinois*, 422 U.S. 590, 603-604 (1975) (*Brown*). In *Brown*, however, the United States Supreme Court also indicated that, when a confession or admission is involved, the giving of Miranda warnings is "an important factor, to be sure, in determining whether [evidence] is obtained by exploitation of an [underlying illegality]." *Brown, supra* at 603.

admissions and consent occurred not at the time of his arrest, but after Damiano had been transported to the police station and had engaged in a series of discussions with officers there. The record is also clear that Damiano initially denied having any marijuana in his home, but later changed his story and signed a form consenting to its search after he learned that the police had secured the premises with his wife and child present, and intended to obtain a search warrant. Finally, it is clear, as the motion judge found, that Damiano's admissions were made voluntarily; his consent to the search was voluntary; and his actions were motivated by a desire to hasten the departure of the police from his home.

Turning next to whether the police properly observed Damiano's Miranda rights, it is clear from the judge's findings that they did. He was advised twice orally of those rights at the police station, and before making any statements or consenting to a search of his home, he executed a written waiver of them. The significance of the observance of these rights, and their waiver, must be assessed in light of the nature of the primary illegality, here the private citizen's illegal interception. In the context of an unlawful arrest, both this court and the United States Supreme Court have made it clear that the protection of constitutional rights requires that "a confession 'obtained by exploitation of an illegal arrest' may not be used against a criminal defendant," *Kaupp* v. *Texas, supra* at 627, quoting *Brown* v. *Illinois*, 422 U.S. 590, 603 (1975); *Commonwealth* v. *Bradshaw, supra* at 258, and that compliance with Miranda alone, following such an arrest, is insufficient to purge a subsequently given confession from its taint. *Taylor* v. *Alabama*, 457 U.S. 687, 690 (1982), quoting *Brown* v. *Illinois, supra* ("If Miranda warnings were viewed as a talisman that cured all Fourth Amendment violations, then the constitutional guarantee against unlawful searches and seizures would be reduced to a mere 'form of words' "); *Commonwealth* v. *Bradshaw, supra* at 258 ("The giving of Miranda warnings alone will not make the inculpatory statements sufficiently an act of free will to purge the primary taint"). These important constitutional considerations, however, are not present here.

We are not faced with determining whether Damiano's

voluntary post-Miranda statements and consent were sufficiently divorced from an illegal detention occasioned by a violation of the Constitution. As discussed above, there was nothing unlawful in the arrest of Damiano, and no violation of his constitutional rights. Rather, we must determine whether Damiano's statements and consent were sufficiently attenuated from the illegal interception of his communications by a private citizen. A similar question was recently considered by the Supreme Court of Maryland in *Miles* v. *State*, 365 Md. 488 (2001), cert. denied, 534 U.S. 1163 (2002). In that case, a citizen, listening to a police scanner, illegally overheard a conversation that appeared to concern a robbery-murder and the concealment of evidence. He contacted the police, and gave them a recording he had made of the conversation. The police listened to the recording, and identified one of the participants to be the defendant's wife. Based on this information, they obtained a search warrant, searched the wife's home, and arrested her. Once arrested, the wife voluntarily consented to a further search of the premises, and voluntarily gave the police other information about where evidence regarding the murder was hidden. The court (applying a State law exclusionary rule identical to Title III) was faced with deciding what had been "purged" from the taint of the illegal interception and what had not. It concluded that the tape-recorded conversation and any evidence found during the execution of the search warrant were inadmissible under the statutory exclusionary rule. It also concluded, however, that the wife's voluntary consent to search and her voluntary statements, even though made while in custody and shortly after her arrest, were intervening events "purg[ing] the taint of the original illegality of the taped cellular phone conversation." *Id.* at 530. Evidence discovered as a result of those voluntary acts was therefore admissible at her husband's trial. The court's ruling, while based on its consideration of the "totality of the circumstances," *id.*, rested in large measure on its determination that "[w]hile an individual's waiver of Miranda warnings taken alone would be insufficient to purge the unlawful conduct under a Fourth Amendment analysis, [the wife's] conduct . . . [was] 'sufficiently an act of free will to purge the primary taint' associated with the intercepted phone call." *Id.* at 526, quoting *Brown* v. *Illinois, supra* at 602.

We are similarly of the view that observance of Damiano's Miranda rights, his waiver of those rights after his transportation from the scene of the arrest, and his subsequent statements and consent are circumstances that weigh heavily in favor of a finding that the evidence garnered thereafter was not obtained by exploiting the underlying illegal interception but by way of Damiano's voluntary acts. As such, the evidence would have been obtained by means sufficiently distinguishable from that illegality to purge it of the primary taint.[17]

Finally, we consider the nature of the police conduct. While we have rejected the "clean hands" exception to § 2515, the complete lack of police involvement in the underlying illegal interception is not an insignificant fact in assessing the necessary reach of the exclusionary rule and the adequacy of the attenuating circumstances in the context of a criminal investigation and prosecution.[18] *Stone* v. *Powell*, 428 U.S. 465, 484 (1976). It was not improper for the police officers to have received or pursued the unsolicited lead provided by a citizen regarding an imminent criminal transaction within their jurisdiction. Even if there had been time (which there was not) for a definitive assessment that the information had been illegally obtained, the duty of the police was to act. *Commonwealth* v. *Brandwein*, 435 Mass. 623, 631 (2002) (police not required to ignore information provided to them by private citizen even if done so in violation of confidentiality obligation). While the conduct of the private citizen in intercepting Damiano's telephone conversation may have been patently unlawful, the actions of the police in responding to the information, placing the defendant under surveillance in a public place, and arresting him after they observed what they believed to be a drug transaction were reasonable and undertaken in good faith. "Ap-

---

[17]There is no evidence in the record that the police made use of the substance of the illegally intercepted communication in an effort to obtain Damiano's statement or consent.

[18]Of course, outside of the statutory context, evidence illegally obtained by a private party and turned over to the police does not violate the Fourth Amendment and, ordinarily, would not be subject to the constitutionally mandated exclusionary rule unless State officials had instigated or participated in the illegality. *Commonwealth* v. *Brandwein*, 435 Mass. 623, 631-632 (2002), and cases cited.

plication of the exclusionary rule in this situation could not have the slightest deterrent effect on the behavior of [the police]. " *Commonwealth* v. *Gallant,* 381 Mass. 465, 470-471 (1980), quoting *United States* v. *Ceccolini,* 435 U.S. 268, 280 (1978) (rejecting application of exclusionary rule to lawfully obtained statement made after defendant was shown unlawfully obtained statement of codefendant). Our consideration of this factor also weighs in the Commonwealth's favor.

In sum, our examination of the facts in this case, in light of the factors set forth in *Kaupp* v. *Texas, supra,* leads us to conclude that the evidence seized in the consented to search of Damiano's house, and any statements he made at the police station after waiving his Miranda rights, were sufficiently attenuated from the unlawful interception as to be purged from its primary taint.

3. *Conclusion.* The judge correctly suppressed the contents of the intercepted communication and the evidence seized in the search of Damiano's person at the time of his arrest. The remainder of the evidence should not have been suppressed.

The order of the motion judge is accordingly affirmed in part and reversed in part. The case is remanded to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*