NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11513

COMMONWEALTH  vs.  NELSON MELO.


Bristol.     February 6, 2015. - July 23, 2015.

Present:  Gants, C.J., Spina, Cordy, Botsford, & Hines, JJ.


Homicide.  Felony-Murder Rule.  Evidence, Admissions and
     confessions, Voluntariness of statement.  Practice,
     Criminal, Capital case, Admissions and confessions,
     Voluntariness of statement, Assistance of counsel, Waiver.
     Constitutional Law, Admissions and confessions, Waiver of
     constitutional rights, Arrest, Probable cause, Assistance
     of counsel.  Arrest.  Telephone.  Search and Seizure,
     Arrest, Probable cause, Fruits of illegal arrest.  Probable
     Cause.  Attorney at Law, Withdrawal.



     Indictment found and returned in the Superior Court
Department on February 9, 2010.

     A pretrial motion to suppress evidence was heard by E.
Susan Garsh, J., and the case was tried before Robert J. Kane,
J.


     Jeanne M. Kempthorne for the defendant.
     Mary O'Neil, Assistant District Attorney, for the
Commonwealth.


     HINES, J.  On November 3, 2009, Chad Fleming (victim) was

killed during a robbery (or attempted robbery) of drugs that he

had planned to sell to the defendant, Nelson Melo.  The defendant and Aaron Morin were charged with murder in the first degree in the death of the victim.  The Commonwealth contended that the defendant acted as a joint venturer with Morin, who was tried separately.  In November, 2012, a jury convicted the defendant of murder in the first degree on the theory of felony-murder.[1,2]  Represented by new counsel on appeal, the defendant argues (1) error in the partial denial of his motion to suppress statements he made to police; (2) error in the denial of defense counsel's motion to withdraw from the case two days before trial; and (3) ineffective assistance of trial counsel.  We conclude that the defendant's motion to suppress statements made after being taken involuntarily to the police station should have been allowed in its entirety because these statements were the inadmissible fruits of an unlawful arrest.  Because the defendant did not seek suppression on this ground, however, we review to determine if the error created a substantial likelihood of a miscarriage of justice, and conclude that it did

---

[1] The jury did not indicate the predicate felony on which the verdict was based.  The possible predicate felonies were armed or unarmed robbery, or the attempt to commit armed or unarmed robbery.

[2] The Commonwealth argued also that the murder was deliberately premeditated and committed with extreme atrocity or cruelty, but the jury did not find the defendant guilty under these theories.

not.  We reject as well the other claims of error and, therefore, affirm the order denying defense counsel's motion to withdraw and affirm the defendant's conviction.

Background.  We recite the facts the jury could have found. The victim, who was twenty-five years of age, lived in Florida and regularly supplied the defendant with Percocet for the defendant's drug dealing business.  On November 3, 2009, the victim flew to Providence, Rhode Island, rented an automobile, and drove to Massachusetts to meet with the defendant to supply him with Percocet.  He telephoned his girl friend to let her know that he had safely landed.  She never heard from him again.

The defendant and his wife[3] were both involved in the sale of Percocet and both developed a dependency on the drug.  The defendant supplied pills to his friend Morin, and also to Michael Stenstream[4] and Stenstream's friend Brandon George.[5]

About one week prior to the murder on November 3, the defendant's wife and George drove to Florida to purchase pills from the victim.  The defendant's wife gave the victim $42,000 in cash.  The victim telephoned the defendant because the amount

---

[3] The defendant's wife testified pursuant to a grant of immunity.

[4] Michael Stenstream testified pursuant to a grant of immunity.

[5] Brandon George testified pursuant to a grant of immunity.

was short of what he had expected. Nevertheless, the victim supplied the defendant's wife with about 4,000 Percocet pills that she brought home to the defendant.

Before this trip to Florida, Morin told the defendant that the victim was dealing to other people in Massachusetts. The defendant expressed disbelief, so Morin, in the defendant's presence, telephoned a man and put him on speakerphone. The man confirmed what Morin had stated.

On the morning of November 2, the day before the murder, Morin visited the defendant at the defendant's wife's home, where they were then living. The defendant's wife had been sleeping. She woke up and heard Morin whisper something about "hitting" someone and something about a black hat. She also overheard Morin say, "I'll take care of the other two" or "They will take care of the other two."

During the late afternoon of November 2, Morin met with his friend Michael Matteson. Matteson owed Morin money, and Morin offered him an opportunity to repay the debt. Morin told Matteson that he was going "to rob his connect's connect and make some money." Morin's "connect," or drug supplier, was the defendant. Morin explained that the defendant's "connect" would be arriving to sell Percocet and they were going to rob him; "they" included Morin, a person named Walter Babcock, and the defendant. Morin explained further that the defendant's

"connect" would be at an apartment owned by the defendant,[6] and Morin would receive a telephone call when he arrived. The "robbers" would go through the back door, Matteson would take the money and drugs, Babcock would grab the defendant's "connect," and Morin would make it look like he was holding down the defendant. Matteson said he would think about it, but ultimately decided not to participate.

On November 3, the defendant and his wife expected the victim to visit them at their apartment. The defendant had his wife help package between $42,000 and $58,000 in cash. The defendant's wife heard him ask someone over the telephone whether he was "going to get it back." Shortly after 8 P.M., the defendant left the apartment wearing a black hat.[7] He took the money with him. Approximately thirty minutes later, the defendant's wife was speaking with the defendant on the house telephone when the victim telephoned her on her cellular telephone. After communicating with her husband, the

---

[6] The defendant became a part owner of his parents' two-family home on Bay Street in Taunton. The defendant's sister, Lucia Rodriguez, and her husband, Gabriel Rodriguez, lived in the first-floor apartment of the home. The defendant, in October, 2009, rented the second-floor apartment to Stenstream.

[7] Stenstream had seen the defendant earlier outside his (Stenstream's) apartment, between 6:30 and 7 P.M. Stenstream told the defendant that he had dinner plans later with his girl friend. The defendant remarked, "You should go out to dinner." Stenstream and his girl friend left for dinner sometime between 8:30 and 8:45 P.M.

defendant's wife told the victim that the defendant wanted him to go to Stenstream's apartment.  See note 6, supra.

At the Bay Street residence, the defendant's sister, Lucia Rodriguez, and her husband, Gabriel Rodriguez,[8] were in the living room of the first-floor apartment.  See note 6, supra. After Gabriel had settled in to watch a television program that commenced at 9 P.M., the defendant came into the apartment and spoke with Lucia.  The defendant told her that he was going upstairs to speak with the victim.

Soon thereafter Lucia heard the footsteps of multiple people heading upstairs.  Gabriel heard more than one set of footsteps coming from above.  The defendant came down from the second-floor apartment and went into the kitchen with Lucia.  He told her to stay downstairs then "bolted" back upstairs.  While the defendant was speaking to her, Lucia heard a "big rumbling."

Gabriel then heard what sounded like multiple people running down the back stairs of the second-floor apartment. Looking outside a window, he saw an automobile leave his home quickly.  Lucia heard people run out and saw a gray automobile departing with two people in the front and one person in the back.  She heard the voice of another person that she did not recognize upstairs with her brother.

---

[8] Because the defendant's sister and her husband share the same last name, we shall refer to them by their first names.

The defendant came downstairs, took some ice packs from the refrigerator, told Lucia he would be "right back," and returned upstairs.  After a few minutes the defendant asked Lucia to check on the victim because he was not responding.  From the kitchen, Gabriel heard something about a fight and heard the defendant say, "I think he got hurt."

Upstairs, Lucia discovered the victim lying on his back on a bed in the spare bedroom.  There were ice packs on his neck.  She tried to see whether he was breathing.  The victim was not moving, and she told the defendant to telephone 911.  The defendant insisted that he wanted his wife.

At about 8:45 or 9 P.M., Morin, out of breath, telephoned the defendant's wife, asking for the defendant.  Morin asked her, "Do you know what happened?"  He added, "Man, that kid was tough."  The defendant's wife told Morin that the defendant was not there.  The defendant's wife asked, "What's going on?" and Morin replied, "I've got to call [Lucia]."  The defendant's wife then telephoned Lucia, who stated that she did not know where the defendant was.  Soon thereafter Lucia arrived and insisted that the defendant's wife and their daughter accompany Lucia back to the Bay Street apartment.  The defendant's wife agreed.

Stenstream and his girl friend returned to his apartment at approximately 9:45 P.M.  He sent a text message to the defendant to confirm whether the defendant was still there.  The defendant

did not respond. There was an unfamiliar automobile in the driveway (the victim's rental vehicle). Stenstream's girl friend waited in his automobile. He then went up to his apartment and shortly thereafter returned to the automobile. Stenstream brought his girl friend upstairs to his apartment and instructed her to go straight to his bedroom, to keep her head down, and not to look around. As she made her way through the apartment, she observed blood on the floor and on the couch.

Stenstream found the defendant and the victim in a spare bedroom. The victim was lying on his back, his eyes and mouth were open, and he was not moving. The defendant was holding a package of peas or ice to the victim's head and was telling the victim to "wake up." Stenstream asked what was going on. The defendant replied, "Don't worry about it. Close the door." Stenstream left, but returned shortly thereafter suggesting that the defendant telephone an ambulance.[9] Stenstream asked again what was going on. The defendant said, "Fucking Ace."[10] Stenstream again asked the defendant to arrange for an

---

[9] Stenstream noticed blood on the sofa and carpet in the living room. He also picked up some zip ties on the living room floor, one of which appeared to have blood on it, and threw them in the garbage. He disposed of some clothing in a dumpster outside. He attempted to use "cleaning solution" to clean the apartment.

[10] "Ace" was Aaron Morin's nickname.

ambulance.  The defendant said, "I'll take care of it.  We should get him to the hospital."

The defendant lifted the victim and started carrying him down the stairs.  The defendant was struggling and asked Stenstream for help.  Stenstream was reluctant, but agreed.  Gabriel came out of his apartment.  He could not find a pulse and noted that the victim was not moving.  Stenstream observed that the victim's chest was blue and his legs were stiff.  Gabriel opened the door to the back seat of the victim's rental vehicle, and the defendant and Stenstream put the victim inside.

The defendant went to Lucia's apartment, where he spoke with his wife, who by then had arrived.  After inquiring about the victim, the defendant's wife went out to the victim's rented automobile where she saw him in the back seat.  She observed that the victim's eyes were open and he was not moving; his wrist was by his forehead in a fixed position.  She started crying and screaming, and yelled at the defendant, "He's dead!"  The defendant drove off with the victim.[11]

The defendant's wife went inside Stenstream's apartment, and he gave her the victim's jacket, shoes, and wallet.  She saw blood "everywhere" in the living room, including on the walls

---

[11] Stenstream testified that after they moved the victim to the automobile, the defendant waited twenty to twenty-five minutes before leaving.

and on the floor.  After about five to ten minutes, she went to Morton Hospital in Taunton, where the defendant had taken the victim.

While in the entrance area to the emergency room, the defendant attempted to perform chest compressions on the victim. Medical personnel took over and brought the victim into an examination room.  It became immediately clear to the staff that the victim was in a state of rigor mortis and was dead.  A physician pronounced the victim dead at 11:05 P.M.  The physician then spoke with the defendant, who provided the victim's name and stated that he was his friend from Florida. The defendant also told the doctor that the victim had gone out for a cigarette and that, when he did not return about fifteen minutes later, the defendant went to check on him, finding him outside on the ground.  In response to questions posed by the doctor, the defendant stated that he did not think that the victim had ingested any drugs.  The defendant was visibly upset.

Police arrived shortly thereafter and, after speaking with the emergency room physician, talked with the defendant in the family room.[12]  In summary, the defendant gave two different accounts of how the victim came to be injured.  In his original

_____

[12] The details of the defendant's statements to police at the hospital and subsequently at the police station are set forth later in this opinion in the discussion of the motion to suppress.

version of events, the defendant stated that the victim had taken a handful of pills and then went outside to make some telephone calls.  The defendant stated that, when the victim had not returned thirty minutes later, he went to check on the victim and found him outside, lying on the ground and bleeding from the head.  The defendant carried the victim upstairs; tried to revive him with ice cubes; and when that did not work, decided about ninety minutes later to bring him to the hospital. In the subsequent version of events, the defendant stated that he and the victim were visiting in Stenstream's apartment when three males arrived to make a drug deal.  The men pulled out guns.  The defendant escaped downstairs.  After the men left, the defendant returned upstairs and found the victim with zip ties around his legs.  The victim was alive and stated that he did not want to go to the hospital, but the defendant brought him anyway.

Police transported the defendant from the hospital to the police station, where he was interviewed after being given Miranda warnings.  In keeping with the motion judge's ruling on the defendant's motion to suppress, a redacted version of the recorded interview was admitted in evidence and played for the jury.  During that portion of the interview, the defendant did

not admit to killing the victim himself or to being involved in the killing, or robbing (or attempting to rob) the victim.[13]

The medical examiner who conducted the victim's autopsy opined that he died as a result of asphyxia by strangulation. She testified that he suffered multiple blunt force injuries to his head, neck, and extremities. He had a gaping laceration to his scalp hidden in his hairline and rib fractures that perforated his lungs. Toxicology screen results revealed that the victim did not have any drugs or alcohol in his system.

On November 4, the defendant's wife went to Morin's home. Morin told her that he owed the defendant money and gave her $5,000. Morin also said he had done a lot for the defendant. On November 5, Morin asked Matteson to meet him. Morin told him that he should say "nothing to anybody."

After speaking to the defendant, the police secured Stenstream's apartment, where they recovered zip ties from the kitchen trash and various items in a dumpster in the rear of the building. They took samples of various red-brown stains from within the apartment, including in the living room and back stairwell, which tested positive for human blood.

---

[13] The defendant did admit that there was a "drug transaction" going on in Stenstream's apartment and that the victim had given the defendant $1,000 for "using the spot." He stated that the victim was alive, talking and mumbling, after the three men had departed.

Deoxyribonucleic acid (DNA) testing revealed that the victim's DNA was present on one of the zip ties recovered. Further, testing showed that the victim's DNA was recovered from a stain on the defendant's shirt and a stain on the upper right arm of the defendant.[14]

Telephone records admitted in evidence at trial established that, on the afternoon of November 3, the telephones of the defendant and the victim were in communication with each other. In addition, between noon and midnight on that day, there were thirty-six contacts between the telephones of the defendant and Morin, including several calls made between 8:45 and 11:30 P.M.

The defendant did not testify. His trial counsel argued that the Commonwealth's witnesses were not to be believed for various reasons, including the fact that most had entered into agreements with the Commonwealth providing for their immunity. Defense counsel also argued that the defendant's statements were not voluntarily made and that the police investigation had been inadequate. Defense counsel argued that the defendant had not been involved and did not share Morin's intent to rob or to kill the victim.

---

[14] The statistical significance of the deoxyribonucleic acid (DNA) testing was presented to the jury. See Commonwealth v. Ortiz, 463 Mass. 402, 408 & n.10 (2012); Commonwealth v. Lanigan, 419 Mass. 15, 20 (1994).

Discussion.  1.  Motion to suppress statements.  a.

Background.  The defendant filed a motion to suppress statements

he made on November 3 and 4 at the hospital and at the police

station, claiming, on State and Federal constitutional grounds,

that his statements should be suppressed because they were not

preceded by an adequate recitation of the Miranda warnings.  He

also argued that he did not make a knowing, intelligent, and

voluntary waiver of the Miranda rights and that his statements

were not voluntary because of his state of exhaustion, drug

ingestion, and drug withdrawal.  Last, the defendant asserted

that police failed to honor his invocation of his right to

counsel.  After an evidentiary hearing, the motion judge, who

was not the trial judge, made the following relevant findings of

fact, which we supplement where necessary with evidence in the

record that is uncontroverted and that was implicitly credited

by the motion judge, see Commonwealth v. Isaiah I., 448 Mass.

334, 337 (2007), S.C., 450 Mass 818 (2008), and with the video

recording of the interview of the defendant, which was admitted

in evidence at the motion hearing.[15]

_____

[15] When a defendant's interview is video recorded, we are "in the same position as the motion judge in viewing the videotape," Commonwealth v. Hoyt, 461 Mass. 143, 148-149 (2011), quoting Commonwealth v. Prater, 420 Mass. 569, 578 n.7 (1995), to determine what occurred therein and therefore independently make that determination.  We have reviewed the video recording that forms the basis of this appeal.

In the late evening of November 3, 2009, Dr. Peter Bosco, an emergency room physician at Morton Hospital, encountered the defendant and the victim, who was slumped over in a wheelchair. The defendant was attempting to perform chest compressions on the victim. The defendant told Dr. Bosco that he had been at the same residence with the victim; that the victim went outside to smoke; and that, when the victim had not returned after fifteen minutes, the defendant went to check on him, finding him there. The defendant did not tell the doctor that he had brought the victim upstairs after finding him. The defendant was agitated and upset, which the doctor construed as appropriate for someone who cared about another.

After examining the victim, Dr. Bosco spoke with the defendant in the family room. He informed the defendant that his friend was dead and that something did not "add up" because rigor mortis already had set in, suggesting that the victim had been dead for several hours. The defendant appeared to be in disbelief; he was distraught and upset. His speech was clear, but he was agitated. As the defendant spoke with Dr. Bosco, he recovered his composure and pleaded with the doctor to do something to resuscitate the victim. Dr. Bosco brought the defendant into the examination room to see the victim. Around this time, shortly after 11 P.M., Taunton police Officer Ralph Schlageter and Detective Robert Schwartz separately arrived in

uniform at the examination room in response to a dispatch of a report that someone had brought a deceased person to the hospital's emergency room.

Dr. Bosco escorted the defendant to the family room. He explained to the defendant that, because the victim's death was suspicious, it would need to be investigated by the police and a medical examiner would take over custody of the body. He asked the defendant to stay so police could speak with him. The defendant was agreeable. No police officers were in the family room at this time. Dr. Bosco had not been asked by police to speak to the defendant.

Dr. Bosco left the family room and informed Schlageter that the victim had a head wound and was in state of rigor mortis when he arrived, and that the defendant was the person who had brought the victim to the hospital. Dr. Bosco did not suspect the defendant of any involvement in the death and did not communicate any such suspicion to Schlageter or to any other officer.

Schlageter then spoke with the defendant in the family room. No one else was present. The defendant was disheveled and visibly upset. He was crying, was almost hysterical, and put his head in his hands. When Schlageter spoke with the defendant, Schlageter viewed him as a concerned friend, not as someone who had been involved in the victim's death. The

defendant did not appear to have been drinking, but seemed to be "on something."

After a couple of minutes, the defendant calmed down so that Schlageter could understand him. They spoke for approximately five minutes. The defendant was coherent and clear. He identified himself and provided his date of birth as well as the victim's full name. The defendant gave Schlageter the following account. Around 9:30 P.M., the victim had visited the defendant in Stenstream's apartment. Sometime later, the victim announced that he wanted to go outside to smoke and to make telephone calls. About twenty to thirty minutes later, the defendant went downstairs to check on the victim and found him on the ground beaten up. The defendant carried the victim upstairs back to the apartment. Because the defendant knew that the victim had a history of drug use, the defendant thought that he may be overdosing, so he laid him on a bed and tried to revive him with ice. The defendant became concerned when he saw the victim's skin turn blue. Schlageter did not question the defendant further. Schlageter left the room, leaving the defendant alone inside. Schlageter did not give any Miranda warnings to the defendant before or during their conversation.

Taunton police Detectives Susan Dykas and Shawn Mulhern arrived at the hospital. They were not in uniform. They viewed the victim, observing the large cut on his head, and learned

that he had been dead for a significant period of time. Schlageter informed the detectives that the defendant had brought the victim's dead body to the hospital and was in the family room. Schlageter also told the detectives the substance of his conversation with the defendant.

The detectives entered the family room, where they found the defendant alone and crying. The detectives did not give any Miranda warnings to the defendant before speaking with him, or at any time while they spoke with him at the hospital.

Mulhern recognized the defendant from the defendant's previous employment as a bouncer at a nightclub and asked what was going on. The defendant gave the following account of what had occurred earlier that day. The defendant had been "chilling" at a second-floor apartment with the victim, who was a friend visiting from Florida. The victim went downstairs to make a telephone call, and when he did not return, the defendant went downstairs and found him unconscious and bleeding from the head. The defendant dragged the victim back upstairs and tried to revive him with ice packs. The defendant took the victim to the hospital when he was not doing well.

Mulhern was the primary questioner and expressed disbelief that the defendant had dragged the victim upstairs. The defendant then gave a different account of what had occurred. In this version, the defendant stated that the victim came from

Florida to use the apartment for a drug deal. Two white males and one black male entered the apartment and argued with the victim and brandished guns, at which point the defendant went downstairs to his sister's apartment. When the commotion was over, the defendant returned upstairs, where he discovered that the victim had been beaten up, his legs bound with zip ties, and his mouth gagged. The victim initially was conscious, but when he lost consciousness, the defendant carried him downstairs with the help of the defendant's sister and brother-in-law, and drove him to the hospital. The defendant did not make any statements that suggested in any way that he was responsible for the victim's death.

The detectives were aware of the defendant's and the victim's prior involvement with drugs, and suspected that the defendant had more information, but not that he was responsible for causing the victim's death. With the defendant's permission, they searched his cellular telephone and noticed numerous calls to a single number (Morin's).

The detectives spent thirty to forty minutes with the defendant in the family room. During this time, he squirmed quite a bit and appeared visibly nervous and upset. He alternated between calmness and lucidity, and incoherency. The defendant's eyes were somewhat bloodshot, and he appeared to be under the influence of drugs.

After they finished speaking with the defendant, Mulhern told the defendant, "We're going to go back to [the] police station and finish this interview because we have to sort through this." Mulhern directed Schlageter to drive the defendant to the police station. Schlageter escorted the defendant to the back seat of a marked police cruiser, which locked and could not be opened from the inside. He did not handcuff the defendant. He did not give Miranda warnings prior to or during the transport to the station, he did not ask the defendant any questions on the way there, and the defendant did not make any statements along the way or on his arrival at the police station.

On arrival, at about 12:45 A.M., Schlageter brought the defendant into the station through the front lobby and to an interview room. There, Mulhern and State police Trooper Anthony Spencer spoke with him. The interview was audio and video recorded, and the defendant was aware that the interview was being recorded. The interview lasted about two hours and forty-five minutes, excluding a one-hour break after two and one-half hours into the interview.

At the beginning of the interview Mulhern read the defendant the Miranda warnings from a preprinted form. The defendant nodded that he understood. After, at 12:55 A.M., the defendant signed a waiver of rights from a notification of

rights form, which he did not read.  Under the signature line on the form, the form stated:  "Person in Custody."

After signing the form, the following exchange between the defendant and Mulhern occurred.

> Defendant:  "I would feel more comfortable if I had a lawyer right now talking, but if you want to show me pictures and names, I'll give it to you.  Because, honestly, like obviously I do not want to get more in a jam than this.  I will show you who did it and everything.  I just want out."
>
> Mulhern:  "Okay.  So, why do you -- you feel like you want to -- if you don't want to talk, that's your right --"
>
> Defendant:  "The thing is I don't know."
>
> Mulhern:  "-- but if you feel like you need a lawyer, you know --"
>
> Defendant:  "I don't know what to do.  Like, honestly, I'll help you but it seems like what do I say."
>
> Mulhern:  "Okay.  Why don't we ask you questions --"
>
> Defendant:  "Alright."
>
> Mulhern:  "-- and we can go from there.  We can find out the story first."
>
> Defendant:  "Alright."

For the first hour of the interview, the defendant did not appear to be particularly tired, but he was experiencing some pain in his groin.  He told the officers that he had stopped dealing drugs and went "cold turkey" two or three months earlier because his marriage and job were being affected.  He admitted

that if he could "make a quick buck here and there," he would sell drugs, but that he did not "touch anything."

After about one hour of questioning, the defendant appeared nervous and jumpy. As Mulhern began to convey a high degree of skepticism of the defendant's statements, the defendant increasingly slouched. The defendant remained alert and consistently resisted suggestions from the officers and confrontational harangues from Mulhern. He insisted that he was not part of the drug deal and that he did not personally struggle with the victim.

Around this time, the tenor of the interview changed. Mulhern frequently interrupted the defendant and, for a period of about twenty minutes, screamed at him in an accusatory tone. The defendant hung his head, but did not buckle. At this point, now about ninety minutes into the interview, the defendant appeared to be tired and started answering some questions with his head down. He adamantly insisted that he did not push or "tussle" with the victim or put his hands on him accidentally or during an argument. The defendant was not easily led by the officers and spontaneously clarified several matters.

At one point the officers left the defendant alone for several minutes, during which time he sniffled and his legs were shaking. The defendant rubbed his eyes and looked exhausted. When the officers returned, the defendant continued to give

coherent, exculpatory responses although visibly tired. For example, when confronted with the fact that bedding (from the apartment) had been stripped and left in a dumpster, the defendant denied having done that. He stated that he had not touched the bedding and that cameras at the location would show that he "didn't do shit." He also did not let himself be trapped by Mulhern's mischaracterizations of what he had said. After about one hour and fifty minutes of questioning had elapsed, the defendant reiterated his statement that he had bolted from the apartment. Although his legs were shaking and he was tired, the defendant was sufficiently alert after two hours of interrogation to divulge the password on his cellular telephone and to go through photographs shown to him by police, indicating what persons he did and did not recognize. He was also careful to identify one person as "looking like" one of the men who had been in the apartment fighting with the victim.

The defendant had self-protective explanations for, among other things, the pain in his groin, the money found in his pocket ($1,600), the injury to his upper lip, a fresh scratch, the blood on his clothes, the time discrepancies in his statements, and his delay in taking the victim to the hospital. From the defendant's responses, it was clear that he understood what the officers were asking him and saying to him. He showed himself to be quick-witted and consistently self-protective.

While he added details as the interview proceeded, the defendant did not at any point admit any involvement in the victim's death.

After viewing the photographs, the defendant's exhaustion began to overcome his ability to speak in a fashion such that his statements could be considered the product of a rational intellect and free will. The defendant's physical state, compounded by Mulhern's shouting, made it unlikely that the defendant's statements from this point onward were the result of his free and willing act.[16] When left alone for two minutes, the defendant moaned and mumbled. His legs shook badly, and his head lolled back and forth. When the officers returned, about two and one-half hours into the interview, the defendant continued speaking, but his head was usually facing down and leaning to the side. His legs were constantly shaking. He did not make much eye contact with the officers, and his responses were often too inaudible to be coherent. His demeanor was so indicative of someone who had lost his ability to focus that Mulhern commented, "I mean you're falling apart . . . doing drugs and dealing drugs . . . ." The defendant was half-asleep, and he rubbed his eyes often, yawned, and barely was able to

---

[16] The judge specified the page of the transcript of the video recording, which had been admitted in two parts at the evidentiary hearing, and would have been approximately two hours and six minutes into the first recording.

keep his eyes open. The questioning, however, did not stop. When a few minutes later the defendant asked if they could finish the interview the next day, he was rebuffed. As the defendant continued to insist that he was "exhausted out of [his] mind," Mulhern started to scream at him again.

After about two hours and thirty-six minutes of questioning, the defendant twice asked for a lawyer, which Mulhern and Spencer simply ignored. Spencer finally ended the interview, at which point the defendant was arrested for misleading a police officer under the witness intimidation statute. He later was charged with murder in the first degree.

The motion judge concluded that the defendant had not been in "custody" for purposes of the requirements of Miranda v. Arizona, 384 U.S. 436, 444 (1966), until Mulhern instructed that the interview at the hospital would continue at the police station and directed a uniformed officer to take the defendant there.[17] The judge further determined that the defendant was in custody at the station when he was given Miranda warnings. The judge concluded that after the defendant was given the Miranda warnings, he voluntarily, knowingly, and intelligently waived

---

[17] Although the defendant did not receive Miranda warnings before being escorted to the police cruiser, the judge noted that he was not asked any questions and did not make any statements during the ride or before the Miranda warnings were given to him at the police station.

them.  She did not consider his initial statement that he would "feel more comfortable" with a lawyer as an unambiguous invocation of the right to counsel.

Noting that the defendant's initial waiver of the Miranda rights does not irretrievably bind him, the judge pointed out that the Commonwealth conceded that the defendant unambiguously invoked his right to counsel when he stated after two hours and thirty-six minutes of questioning that he needed a lawyer. While the judge agreed that the defendant had invoked his right to counsel at this point, she determined that somewhat earlier in the interrogation (see note 16, supra), the defendant's statements were no longer voluntary.  The judge based her conclusion on the circumstances of Mulhern's shouting at the defendant, the defendant's state of exhaustion, and the after-effects of whatever substance the defendant had ingested during the day.  Suppression of the defendant's statements from that point of the interview and onward therefore was necessary. Based on these findings, the motion judge denied in part and allowed in part the defendant's motion to suppress.

b.  Standard of review.  "We review de novo any findings of the motion judge that were based entirely on the documentary evidence, i.e., the recorded interviews of the defendant." Commonwealth v. Thomas, 469 Mass. 531, 539 (2014).  "We accept other findings that were based on testimony at the evidentiary

hearing and do not disturb them where they are not clearly erroneous."  Id.  "However, we 'make an independent determination as to the correctness of the judge's application of constitutional principles to the facts as found.'"  Id., quoting Commonwealth v. Tremblay, 460 Mass. 199, 205 (2011).

c.  Validity of waiver of Miranda rights.  The defendant argues that his waiver of Miranda rights was invalid because it was not knowingly and voluntarily made.  Because the defendant was advised of, and waived, the Miranda rights, the issue becomes whether the Commonwealth has proved "the validity of a Miranda waiver beyond a reasonable doubt."  Commonwealth v. Edwards, 420 Mass. 666, 669 (1995).  See Commonwealth v. LeBeau, 451 Mass. 244, 254-255 (2008).  "To be valid the waiver must be made voluntarily, knowingly, and intelligently."  Edwards, supra at 670.  "In determining whether a waiver was made voluntarily, the court must examine the totality of the circumstances surrounding the making of the waiver."  Id.  "Relevant factors to consider include, but are not limited to, 'promises or other inducements, conduct of the defendant, the defendant's age, education, intelligence, and emotional stability, experience with and in the criminal justice system, physical and mental condition, the initiator of a deal or leniency (whether the defendant or police), and the details of the interrogation, including the recitation of Miranda warnings.'"  Commonwealth v.

Jackson, 432 Mass. 82, 86 (2000), quoting Commonwealth v. Mandile, 397 Mass. 410, 413 (1986).

The defendant challenges the judge's conclusion that his waiver was valid for several factual reasons, including that he had not been asked whether he wished to waive his rights; he had not been asked whether he wished to speak with police; and the fact that his signature on the notification of rights form indicated only that he was advised of the Miranda warnings, not that he had waived them. The defendant also argues that he "obviously" was undergoing drug withdrawal. We conclude that the judge's findings and conclusions are supported by the evidence.

The defendant signed the notification of rights form, which expressly indicates that the person signing understands the Miranda rights and "knowingly waive[s]" those rights; heard the recitation of the Miranda warnings; and nodded, which reasonably could be inferred as indicating that he understood them. Thereafter, he engaged in discussion with the officers. "This conduct hardly expressed an unwillingness to continue speaking with police that could be 'considered tantamount to the exercise of the right to remain silent.'" Commonwealth v. Garcia, 443 Mass. 824, 833 (2005), quoting Commonwealth v. Selby, 420 Mass. 656, 662 (1995). Further, during the admitted portion of the interview, the defendant appeared alert, coherent, calm for the

most part, and appropriately responsive, and appeared to understand the situation and what was asked of him. He was drinking a beverage, and the interview was conducted in an interview room as opposed to a cell. Although the defendant very well may have been under the influence of drugs, there was no evidence that the defendant's resulting physical condition was so disabling as to render his waiver invalid. The judge thoroughly considered the evidence concerning the defendant's likely drug use, which does not compel a conclusion that his Miranda waiver was invalid. See Commonwealth v. Howard, 469 Mass. 721, 728 n.7 (2014), and cases cited; Commonwealth v. Walker, 466 Mass. 268, 274-275 (2013). See also Commonwealth v. Brown, 462 Mass. 620, 625-627 (2012). The evidence supports the judge's conclusion that the defendant's Miranda waiver was valid.[18]

d. Invocation of right to counsel. The defendant contends that the motion judge erred in concluding that his statement, made after he was given the Miranda warnings, "I would feel more comfortable if I had a lawyer right now talking, but if you want

---

[18] Based on our independent review of the video recording of the interview, the judge was warranted in concluding beyond a reasonable doubt that the defendant's statements, made up until the point where she suppressed them, were made voluntarily. See Commonwealth v. Medeiros, 395 Mass. 336, 343 (1985) (although voluntariness and Miranda waiver and voluntariness of statement are distinct inquiries, totality of circumstances test under each analysis is same).

to show me pictures and names, I'll give it to you," was an ambiguous and therefore ineffective invocation of the right to counsel.  We reject the defendant's contention.

During a custodial interrogation, "[i]f the accused indicates that he wishes to remain silent, 'the interrogation must cease.'  If he requests counsel, the interrogation must cease until an attorney is present."  Commonwealth v. Santos, 463 Mass. 273, 285 (2012), quoting Edwards v. Arizona, 451 U.S. 477, 481 (1981).  The request or invocation of counsel must be "a sufficiently clear statement such 'that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.'"  Commonwealth v. Hoyt, 461 Mass. 143, 150 (2011), quoting Davis v. United States, 512 U.S. 452, 459 (1994).

Here, the defendant's statement, when viewed in context, was not an unambiguous request for counsel and reflected a desire ultimately to go forward with questioning without an attorney.  "When a suspect's statement . . . simply reflects his musing about the possibility of stopping the questioning until he has spoken with an attorney, we have consistently found the statement to be too ambiguous to constitute an unequivocal invocation of the right to counsel."  Commonwealth v. Morganti, 455 Mass. 388, 398 (2009), S.C., 467 Mass. 96, cert. denied, 135

S. Ct. 356 (2014). We conclude that the defendant's statement falls into this category.

The defendant further argues that, even if his invocation of the right to counsel had been ambiguous, the police were required under art. 12 of the Massachusetts Declaration of Rights to clarify the defendant's intent before proceeding with questioning. In support of this contention, he cites to Commonwealth v. Clarke, 461 Mass. 336, 349 (2012), and Santos, 463 Mass. at 286. Those cases, however, do not support the defendant's argument that such a clarification was required here. In Santos, supra at 285-286, we suggested clarification as the better practice because the defendant initially had unequivocally invoked his right to counsel but then continued, without any intervening comment or question by police, to speak. We concluded that, in those circumstances, the police could have been uncertain concerning the nature and scope of the defendant's invocation, and before recommencing questioning would be "entitled to ask a question to clarify the defendant's intent." Id. at 286. In Clarke, supra at 343, we dealt with a defendant's unequivocal invocation of his right to remain silent, not an invocation of a right to counsel. No clarification is required where, as the judge found here, the defendant equivocated, stating only that he would "feel more comfortable with an attorney."

e. Statutory right to a telephone call. We reject the defendant's argument that his statements during the interview should be suppressed because the police did not afford him his statutory right under G. L. c. 276, § 33A, to use the telephone when he arrived at the police station or after questioning had exceeded one hour. This right "did not accrue until he was formally arrested." Commonwealth v. Hampton, 457 Mass. 152, 159 (2010). See Commonwealth v. Dagley, 442 Mass. 713, 719 (2004), cert. denied, 544 U.S. 930 (2005); Commonwealth v. Rivera, 441 Mass. 358, 374-375 (2004).

f. Detention of the defendant. For the first time on appeal the defendant argues that his involuntary transport to the police station for questioning amounted to an unlawful arrest under the Fourth and Fourteenth Amendments to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights because it was not supported by probable cause.[19] He asserts that the entirety of his interview with police therefore should be suppressed as the fruit of the illegal arrest. Last, the recitation of the Miranda warnings, he contends, did not purge the taint of the illegal arrest. Because the defendant did not raise this claim below, we review for error and, if so,

---

[19] The defendant does not argue that art. 14 of the Massachusetts Declaration of Rights affords him any greater protection than that afforded by the Fourth and Fourteenth Amendments to the United States Constitution.

whether the error caused a substantial likelihood of a miscarriage of justice. See Commonwealth v. Tu Trinh, 458 Mass. 776, 782-783 (2011).

Generally speaking, there are three categories of police-citizen encounters: "(1) consensual encounters which do not implicate the Fourth Amendment;[20] (2) investigative detentions which are Fourth Amendment seizures of limited scope and duration which must be supported by a reasonable suspicion of criminal activity[,[21] Terry v. Ohio, 392 U.S. 1 (1968);] and (3) arrests, the most intrusive of Fourth Amendment seizures and reasonable only if supported by probable cause." United States v. Madden, 682 F.3d 920, 925 (10th Cir. 2012). Here, the judge's decision did not address the issue (because the

---

[20] Submission to a claim of authority is not synonymous with voluntary consent. See Kaupp v. Texas, 538 U.S. 626, 631 (2003); United States v. Perez-Montanez, 202 F.3d 434, 438 (1st Cir.), cert. denied, 531 U.S. 886 (2000). There was no evidence that the officers told the defendant that he was free not to enter the cruiser to go to the police station.

[21] The parameter of an investigatory stop is exceeded if it "continues indefinitely[;] at some point it can no longer be justified as an investigative stop." United States v. Sharpe, 470 U.S. 675, 685 (1985). While "the brevity of the invasion of the individual's Fourth Amendment interests is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion," United States v. Place, 462 U.S. 696, 709 (1983), the Supreme Court has emphasized "the need to consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes," Sharpe, supra.

defendant did not make the argument below), but her findings instruct our conclusion.

The judge found that once Mulhern determined that further questioning would continue at the police station and directed an officer to transport the defendant there, the defendant was in custody, albeit for purposes of Miranda. She further found, based on the notification of rights form designating the defendant as a "person in custody," and statements made by the interviewing officers, that a reasonable person in the defendant's position would not have felt free to leave. We agree with the defendant that, in these circumstances, his involuntary transport and detention for interrogation purposes amounted to a "seizure" for Fourth Amendment purposes and became the functional equivalent of an arrest.[22]

In Kaupp v. Texas, 538 U.S. 626, 629 (2003), the United States Supreme Court stated the settled rule that "involuntary

---

[22] The judge expressly discredited Taunton police Detective Shawn Mulhern's testimony that the defendant acquiesced or actually agreed to go to the police station for questioning. Cf. Commonwealth v. Cruz, 373 Mass. 676, 683 (1977) (no illegal detention of defendant where defendant consented to enter police cruiser and go to station for questioning). We add that there was no evidence that Mulhern sought to relocate the defendant to the police station for safety or security issues. Cf. Florida v. Royer, 460 U.S. 491, 504-505 (1983) ("there are undoubtedly reasons of safety and security that would justify moving a suspect from one location to another during an investigatory detention, such as from an airport concourse to a more private area").

transport to a police station for questioning is 'sufficiently like arres[t] to invoke the traditional rule that arrests may constitutionally be made only on probable cause.'" Id. at 630, quoting Hayes v. Florida, 470 U.S. 811, 816 (1985).  See Florida v. Royer, 460 U.S. 491, 503 (1983) (concluding that airport detention exceeded limits of investigatory stop and amounted to de facto arrest); Dunaway v. New York, 442 U.S. 200, 212 (1979) (concluding that where petitioner was taken from neighbor's home to police vehicle, transported to police station, and placed in interrogation room, detention was "indistinguishable" from traditional arrest and required probable cause or judicial authorization); United States v. Ryan, 729 F. Supp. 2d 479, 487 (D. Mass. 2010) (stating that limitation on valid investigatory stop is that suspect may not be removed to police station without his or her consent).  Indeed, "the line is crossed when the police, without probable cause or a warrant, forcibly remove a person from his home or other place in which he is entitled to be and transport him to the police station, where he is detained, although briefly, for investigative purposes." Hayes, supra.  "In the name of investigating a person who is no more than suspected of criminal activity, the police may not . . . seek to verify their suspicions by means that approach the conditions of an arrest." Royer, 460 U.S. at 499.  "Nothing is more clear than that the Fourth Amendment was meant to prevent

wholesale intrusions upon the personal security of our citizenry, whether these intrusions be termed 'arrests' or 'investigatory detentions.'" Davis v. Mississippi, 394 U.S. 721, 726-727 (1969). See 2 W.E. Ringel, Searches and Seizures, Arrests and Confessions § 23:5, at 23-18 (2d ed. 2014) (Supreme Court has held that when police take suspect involuntarily for station house questioning, such custodial detention requires probable cause as it is equivalent to formal arrest; investigatory detentions not requiring probable cause must be brief in duration and not lengthy investigation to develop probable cause). Many United Stated Circuit Courts of Appeals have followed this precedent.[23]

---

[23] See, e.g., Centanni v. Eight Unknown Officers, 15 F.3d 587, 591 (6th Cir.), cert. denied, 512 U.S. 1236 (1994) (removal of suspect from scene of stop generally marks point at which Fourth Amendment demands probable cause; "there is no such thing as a Terry 'transportation'"); United States v. Parr, 843 F.2d 1228, 1231 (9th Cir. 1988) (line between investigatory stops and arrests may be drawn on point of transporting defendant to police station); United States v. Hernandez, 825 F.2d 846, 851 (5th Cir. 1987), cert. denied, 484 U.S. 1068 (1988) (removal of suspect from scene of stop to police headquarters usually marks point when investigative stop becomes de facto arrest); United States v. Ceballos, 812 F.2d 42, 49 (2d Cir. 1987) (transporting suspect to police station exceeds limits of Terry-type stop and becomes unlawful arrest); United States v. Gonzalez, 763 F.2d 1127, 1133 (10th Cir. 1985) (forcing suspect to go to police station crosses line into de facto arrest).

Because there was no probable cause to arrest the defendant[24] or judicial authorization to do so, "well-established precedent requires suppression of the [statement] unless that [statement] was 'an act of free will [sufficient] to purge the primary taint of the unlawful invasion.'" Kaupp, 538 U.S. at 632-633, quoting Wong Sun v. United States, 371 U.S. 471, 486 (1963). See Commonwealth v. Damiano, 444 Mass. 444, 453 (2005). Demonstrating that the underlying illegality is purged from taint falls on the Commonwealth. See Kaupp, supra at 633; Damiano, supra at 454. Relevant considerations include "(1) the temporal proximity of the admission to the arrest; (2) the presence of intervening circumstances between the arrest and the admission; (3) the observance of the Miranda rule subsequent to the unlawful arrest; and (4) the purpose and flagrancy of the official misconduct." Damiano, supra at 455. The observance of the Miranda rule standing alone is insufficient to remove the taint of an unlawful detention. See Kaupp, supra; Commonwealth v. Bradshaw, 385 Mass. 244, 258 (1982).

Although the officers recited the Miranda warnings to the defendant, consideration of the remaining factors reveals little to no attenuation between the arrest and interrogation. The defendant was questioned within ten minutes of arriving at the

---

[24] The Commonwealth concedes this point, and the judge's findings warrant it, as the officers testified that the defendant had not yet become a suspect in the victim's killing.

police station, and no intervening circumstances occurred before the interview commenced.  Further, in transporting the defendant to the police station for interrogation, the police sought expediently to confirm or to dispel whether the defendant had involvement in the victim's death.  On balance of the factors, we conclude that the Commonwealth has not satisfied its burden here.

Our conclusion that the defendant's statement resulted from an unlawful arrest does not end our inquiry.  We must determine, under the circumstances, whether the erroneous admission of the defendant's interview with police (the portion that the motion judge did not suppress) created a substantial likelihood of a miscarriage of justice.  See Commonwealth v. Gonzalez, 469 Mass. 410, 417 (2014).  The relevant inquiry is whether the jury's verdict finding that the defendant was guilty of felony-murder would likely have been the same had the interview been suppressed.  Id.

The defendant argues that his recorded interview was the "clearest and least equivocal evidence that any robbery or attempted robbery actually took place in the apartment."  We disagree.  The evidence, apart from the defendant's statements to the police during the recorded interview, was strongly supportive of the Commonwealth's theory that the defendant had participated in a joint venture to rob the victim on the night

of the murder.  We recount the relevant evidence below to illustrate the point.

The defendant had already told police at the hospital that the victim was at the apartment for a drug deal; that three men entered, some of whom had guns; that the defendant escaped downstairs to his sister's apartment; and that, after the men left, the defendant found the victim alive, but badly beaten. Thus, the purpose of the encounter with the victim did not derive solely from the defendant's recorded interview.

Although the defendant denied any involvement in the crime, it was the defendant's wife who firmly placed the defendant in the midst of the scheme to rob the victim.  Her testimony that the defendant instructed the victim to meet at Stenstream's apartment instead of his wife's apartment as originally planned; that the defendant packaged between $42,000 and $58,000 in cash and took it with him when he left to meet the victim; and that the defendant questioned someone on the telephone before he left for Stenstream's apartment as to whether he was "going to get it back" established the defendant as a willing and necessary participant in the plot to rob the victim.  Also, Matteson's testimony that Morin, the day before the killing, had informed him of a plot involving Morin, the defendant, and others to rob the victim at an apartment owned by the defendant further corroborated the defendant's wife's extremely damaging

testimony. From this testimony, the jury reasonably could have inferred that the defendant was involved in a robbery or attempted robbery of the victim.

To be sure, some of the defendant's statements in his recorded interview added information that the jury did not hear or learn elsewhere at trial. For instance, in the recorded interview the defendant stated that the victim told the three men that they owed him money and that the victim had a large plastic bag in his pocket that contained drugs. This information, however, did not implicate the defendant in the robbery or attempted robbery.

While the defendant's recorded interrogation added for the first time that one of the men hit the victim with a gun, that detail did not add anything of significant value, as the defendant kept to his story that he "bolted" as soon as he had the opportunity and that he did not have any involvement with the three men and the incident that occurred.

Also, the defendant's admission in his recorded interview that $1,000, from the $1,600 discovered on his person that night, was payment from the victim for use of the apartment was not relevant to the defendant's participation in a robbery or attempted robbery of the victim. Rather, the admission concerning the money only strengthened the Commonwealth's existing evidence that the defendant was at that time, contrary

to his statements, still involved in drug dealing and perhaps even this particular drug deal.  None of the defendant's statements suggested that the drug deal was a ruse for a robbery or attempted robbery.  That suggestion came from Matteson during his trial testimony.

We turn now to the information obtained from the defendant's cellular telephone, which the defendant argues derived from the illegal interrogation.  While at the hospital when he was not in custody, the defendant granted permission to police to look at his cellular telephone.  From this examination, police learned that the defendant's cellular telephone recently had been in communication with Morin's telephone numerous times.  Further, as we have already noted, the defendant's wife testified about communications between Morin and the defendant on the day before the victim's death, and a telephone call from Morin looking for the defendant after something had "happened" with "that kid" who was "tough."  Also, telephone records of Morin's cellular telephone independently supported the prosecutor's suggestion that the telephones of the two men had been in frequent communication before and after the victim's death.  The defendant's telephone records were cumulative of Morin's records and other evidence, and any effect on the jury from their admission thus was minimal.

A close examination of the defendant's statements in the recording shows that his statements strengthened the Commonwealth's claim that the defendant was involved in drugs and drug dealing, but not in a robbery or attempted robbery of the victim. Concerning the robbery or attempted robbery, the interview bore little on the jury's determination that the defendant was a joint venturer in the robbery or attempted robbery of the victim. The significant evidence, which the defendant overlooks, was the testimony of his sister and her husband regarding what they heard that night above them; his wife's testimony regarding the events of the night; and Matteson's testimony that Morin had revealed to Matteson what had been planned and who was involved the day before the victim's death. In these circumstances, we conclude that no substantial likelihood of a miscarriage occurred by the erroneous admission of the defendant's statements made during his interview with police.

2. Motion to withdraw. The defendant argues that the judge erred in "forcing" him to trial with defense counsel who unsuccessfully had sought to withdraw his representation of the defendant just two days before trial. He further contends that he was deprived of the effective assistance of trial counsel because he was forced to stand trial with defense counsel who

did not want to represent him and who purportedly had admitted to preparing his defense at a "low level."

On October 29, 2012, which was two days prior to trial, defense counsel, who was retained by the defendant and his family, filed a motion to withdraw. In support of that motion, defense counsel filed an affidavit stating the following. Communication between defense counsel and the defendant had "broken down." Defense counsel had learned that the defendant recently had accused him of "jamming him up," not preparing his case, and forcing him to accept a plea to murder in the second degree. The defendant had telephoned his office on October 25 and had told an associate that he was dissatisfied with defense counsel's representation and no longer wished for him to serve as his trial counsel. Defense counsel indicated that the defendant felt that counsel was not acting in the defendant's best interests; that he had not properly prepared the defendant's case; and that, by advising the defendant to take a plea, he had abandoned the defendant's case. Defense counsel stated that the defendant wanted to be heard by the court and that he had advised the defendant and his family that they needed to arrange for successor counsel. Defense counsel went on to state that, notwithstanding the defendant's position, he was continuing to prepare the case for trial. Defense counsel also represented that, with several exceptions regarding some

specific pretrial preparation (preparing a witness list, for example), he had been fully prepared for trial prior to the defendant's telephone call on October 25.

The judge, who was also the trial judge, held a hearing on October 29. The defendant explained:

> "I no longer trust [defense counsel], I lost all my faith in him. I feel [that he] hasn't taken my best interest, fifteen to life, when I'm one hundred per cent innocent. He also told me he'll put no more effort into my case. I'm indigent. And I have lawyers that state that, your Honor. On top of that, writing letters that you're going to proceed on my trial at a low level."

The defendant added that he was dissatisfied because he requested, but was not afforded, either an expert to review the medical examiner's autopsy report or a private investigator to speak with "a few people." The defendant also wanted "some motions in" after he "lost" the suppression motion.

The letters to which the defendant referred included one dated October 15, 2012, from defense counsel to the defendant, which the defendant submitted to the judge. In the one-page letter, defense counsel expressed concern regarding the large amount owed for his services and expenditures. Defense counsel also wrote, "Much work remains on your case although I am ready on a low level. I feel however you want additional work and I am willing to provide it subject to me getting paid."

Defense counsel confirmed at the hearing that he had sent the defendant the October 15 letter. He explained what he meant

by the phrase "low level," which included preparing indexes for every police report, every grand jury hearing, and every other hearing, including the extensive suppression hearing. "Low level" preparation, according to defense counsel, did not constitute extensive trial preparation, which involves working "day and night" and weekends in order to try the case when the trial date is firm. When defense counsel authored the letter, he was not yet conducting actual trial preparation.

Defense counsel told the judge that communication between him and the defendant deteriorated for several reasons, including that the defendant refused to accept the impact of our decision in Commonwealth v. Zanetti, 454 Mass. 449, 466-468 (2009), which effectively erased the distinction between principal and joint liability with regard to joint venture liability. In addition, defense counsel informed the judge that he had consulted at least two doctors to review the autopsy report, and the defendant did not want to accept their opinions that there was no basis to dispute the victim's cause of death. The defendant also "reject[ed] entirely" the fact that his wife, who apparently was not going to testify against him, had changed her mind and would be testifying "to some major things that are very problematic." Another damaging fact that the defendant refused to accept was his sister Lucia's expected testimony that, on the night of the killing, after the group had run out

of Stenstream's apartment, she heard the defendant and another voice from Stenstream's apartment, which was significant because the testimony supported an inference that the victim had been alive and alone with the defendant. Defense counsel stated that his plea recommendation had nothing to do with "the payment of fees, but an evaluation of the evidence."[25]

Defense counsel sought to withdraw, but stated he would "do [his] best" were the judge to order him to proceed. The judge ruled that the defendant had the right to bring in new counsel "provided new counsel is prepared to impanel this case [in two days]." The judge noted that the case commenced in "the early portion of 2010" and that the Commonwealth "can be prejudiced by the denial of a speedy trial as its witnesses' memories may dull and wane by the passage of time." The judge added that the motion judge had actually agreed with defense counsel regarding a portion of the motion to suppress, so that it was not fair to

---

[25] Without citation to any authority, the defendant's appellate counsel suggests that the defendant's trial counsel revealed communications that were protected by the attorney-client privilege. We have stated, however, where a defendant "essentially accuse[s] trial counsel of incompetence in circumstances covered by the attorney-client privilege and to which the only witnesses were the defendant and trial counsel, the privilege must be deemed waived, in part, to permit counsel to disclose only those confidences necessary and relevant to the defense of the charge of ineffective assistance of counsel." Commonwealth v. Silva, 455 Mass. 503, 529 (2009), and cases cited. Here, defense counsel acted appropriately, revealing communications that were responsive and relevant to the defendant's claims of ineffective assistance.

state that the motion had been lost.  The judge stated that an attorney is not to "operate simply as an accommodating party" and is required to be effective in plea negotiations in addition to a trial.  He validated the challenges defense counsel faced based on the circumstances and facts of the case.  Last, the judge rejected the accusation that defense counsel had abandoned the defendant, pointing to his voir dire questions and motions in limine that had been filed.

The judge declined to continue the case to permit the defendant to obtain new counsel.  The defendant stated that he did not see how it could be possible to try the case in two days with new counsel.  The judge denied the motion to withdraw.

We review the denial of a motion to withdraw counsel for abuse of discretion.  Commonwealth v. Rice, 441 Mass. 291, 297 (2004).  We also review the denial of a request for a continuance for abuse of discretion.  Commonwealth v. Ray, 467 Mass. 115, 128 (2014).

"The Sixth Amendment [to the United States Constitution] guarantees the right to effective assistance of counsel, but it 'does not invariably require a "meaningful attorney-client relationship."'"  Commonwealth v. Britto, 433 Mass. 596, 600 (2001), quoting Commonwealth v. Tuitt, 393 Mass. 801, 806 (1985).  "Freedom to change counsel . . . is restricted on the commencement of trial."  Commonwealth v. Chavis, 415 Mass. 703,

711 (1993). "A motion to discharge counsel, when made on the eve of trial, or on the day on which trial is scheduled to begin, 'is a matter left to the sound discretion of the trial judge.'" Tuitt, supra at 804, quoting Commonwealth v. Moran, 388 Mass. 655, 659 (1983). There is no "mechanical test" that applies. Chavis, supra. A trial judge is to "balance the movant's need for additional time against the possible inconvenience, increased costs, and prejudice which may be incurred by the opposing party if the motion is granted. He must also give due weight to the interest in the judicial system in avoiding delays which would not measurably contribute to the resolution of a particular controversy." Id., quoting Commonwealth v. Cavanaugh, 371 Mass. 46, 51 (1976).

Turning to requests for continuances, we have explained that "there is no 'mechanical test' for determining whether the denial of a continuance constitutes an abuse of discretion because we must examine the unique circumstances of each case, particularly the reasons underlying the request." Commonwealth v. Pena, 462 Mass. 183, 190 (2012). "A judge should grant a continuance only when justice so requires, balancing the requesting party's need for additional time against concerns about inconvenience, cost, potential prejudice, and the burden of the delay on both the parties and the judicial system." Ray, 467 Mass. at 128. "[C]ognizant of a criminal defendant's

constitutional entitlement to assistance of counsel, who 'must be afforded "a reasonable opportunity to prepare and to present the defence,"'" id. at 128-129, quoting Cavanaugh, 371 Mass. at 50, we have cautioned that "a trial judge may not exercise his discretion in such a way as to impair" this right. Ray, supra at 129, quoting Commonwealth v. Miles, 420 Mass. 67, 85 (1995).

Here, the judge gave the defendant the opportunity to explain his reasons for his dissatisfaction with defense counsel and acted within his discretion in denying both the motion to withdraw and the request for a continuance. See Chavis, 415 Mass. at 712 (judge gave defendant "fair opportunity to explain the reasons for his dissatisfaction with trial counsel"). The judge appropriately gave consideration to the facts that the case was scheduled for trial in two days, the defendant had been indicted some two years earlier, and he had not engaged successor counsel. The judge did not misstate the law concerning a defendant's right to a speedy trial, but rather, in context, properly considered the defendant's needs against the legitimate needs of judicial administration, including the need for witness testimony to be unhindered due to the passage of time. See Commonwealth v. Gilchrest, 364 Mass. 272, 276 (1973). The judge could properly take such matters into account even in the absence of evidence of a calculated effort made by the defendant to postpone the trial.

The judge considered the nature and seriousness of the conflict between the defendant and his counsel. See Rice, 441 Mass. at 297. Implicit in the judge's conclusion was that he credited defense counsel's explanation of what he meant by using the phrase "low level." Further, the judge credited defense counsel's statements that he was prepared for trial, noting his extensive trial preparation efforts, namely the motions he had filed on the defendant's behalf and the filings submitted in preparation of jury empanelment. Cf. Cavanaugh, 371 Mass. at 48, 57 (error to deny continuance where defense counsel stated he was not prepared). The judge explored the allegations that defense counsel had not met all of the defendant's demands, finding them unreasonable or unsupported in the circumstances. For these reasons, there is no basis for the defendant's argument that the judge abused his discretion in failing to reach a different conclusion, namely, that defense counsel had "washed his hands" of the defendant and was willing to put in only minimal effort for trial. See Britto, 433 Mass. at 601 (stating that counsel's failure to meet all of defendant's demands does not equate with "an irreconcilable breakdown of communication").

Last, concerning the defendant's claim that he was deprived of the effective assistance of trial counsel because he was forced to stand trial with defense counsel who did not want to

represent him and who purportedly had admitted to preparing his defense at a "low level," the "ultimate question is whether the defendant likely would be denied the effective assistance of counsel if counsel is not removed." Id. Based on the record before us, we conclude that the defendant has failed to make the requisite showing.

3. Ineffective assistance of counsel. The defendant's ineffective assistance of counsel argument is predicated on the claims of error we have already addressed and, thus, lacks merit.

4. Relief pursuant to G. L. c. 278, § 33E. Pursuant to our statutory duty, we discern no basis to reduce the verdict or to order a new trial pursuant to G. L. c. 278, § 33E.

Conclusion. We reverse the order denying in part the defendant's motion to suppress statements. We affirm the order denying defense counsel's motion to withdraw. We affirm the defendant's conviction.

So ordered.