NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

23-P-1458

COMMONWEALTH

vs.

ZENO Z., a juvenile.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

A juvenile filed this interlocutory appeal from an order denying his motion to suppress his statements made to police during two interviews conducted just over an hour apart.  The juvenile argues that the motion judge erred in finding:  (1) he was not subject to a custodial interrogation during the first interview and therefore Miranda warnings were not required; (2) he voluntarily waived his Miranda rights during the second interview; (3) his mother, who was present during the second interview, qualified as an interested adult; and (4) the statements he made during the second interview, where he confessed to unlawful possession of a firearm, were not tainted by the illegality of the first interview and therefore did not

require suppression.  The order denying the motion to suppress is reversed as to the juvenile's statements made during the first interview but affirmed as to the juvenile's statements made during the second interview.

Background.  The following facts are drawn from the judge's findings, from undisputed facts in the record that she implicitly credited, and from the video recordings (video) of the juvenile's interactions with police, including the two interviews pertinent to this appeal, which we have independently reviewed.  See Commonwealth v. Tremblay, 480 Mass. 645, 654-655 (2018); Commonwealth v. Jones-Pannell, 472 Mass. 429, 436 (2015).

On October 13, 2020, at around 9:30 P.M., police and emergency medical services (EMS) responded to a "ShotSpotter" activation at 83 Kingsdale Street and reported car accident at the nearby intersection of Blue Hill Avenue, Harvard Street, and Talbot Avenue.[1]  Lieutenant Brooks (Brooks), who responded to the scene, observed a gun on the driver's seat where the operator had been sitting as EMS was removing the operator from the vehicle.  The operator of the vehicle had suffered a gunshot wound to the head, and the vehicle was damaged by ballistics fire.  Due to the severity of the operator's injuries, Brooks

---

[1] The juvenile also called 911 following the accident.

2

called "full notifications" which alerts relevant authorities to the existence of a potential homicide.

Brooks was informed that there had been a passenger in the vehicle and, with his badge and gun visible, approached the juvenile who was standing at a bus stop nearby and appeared to be interested in the accident.[2]  Brooks asked the juvenile if he was in the vehicle and the juvenile politely said that he was. Brooks also asked the juvenile the name of the operator of the vehicle as well as the juvenile's name, date of birth, address, and phone number, which the juvenile provided.  Brooks informed the juvenile that "they're gonna have a couple questions for you about everything that's going on here alright, because it seems like it might have been a little more than a car accident involved here."  Brooks then pat and frisked the juvenile and told him, "We're gonna have you go to the office, we'll give you a ride, [and] talk to the detectives."  A few moments later, after Brooks had walked away, the juvenile was approached and asked by a different officer on the scene if he had been in the vehicle.  The juvenile told that officer that he was in the vehicle and briefly described how the shooting and the accident transpired.  A third officer standing next to the juvenile again asked the juvenile for his personal information, and after

_____

[2] The juvenile's interaction with Brooks was recorded by a body camera footage which we have reviewed.

3

collecting his information stated to an officer nearby, "he's gonna come with us."[3]  The third officer, along with another officer, transported the juvenile, without handcuffs, to the police station in the back of a marked police cruiser.  While they were en route to the station, one of the transporting officers communicated over his radio that they were transporting a "juvenile to HQ."

Once the juvenile arrived at the police station, he was escorted to the second-floor homicide unit and brought to a small interview room at 10:06 P.M.  An interview of the juvenile was then conducted by Detective Callahan and Detective Kornetsky.  At the beginning of the interview, Callahan informed the juvenile that the interview would be audio and video recorded and then asked the juvenile for his name and date of birth, at which time Callahan noted that the juvenile was seventeen years old.  As a result, Callahan asked the juvenile if his mother and father knew what was going on or where he was, to which the juvenile responded no.  Callahan then asked the juvenile to tell him "what happened . . . that caused [the juvenile] to come up to the unit.".  The juvenile explained that earlier that night he decided to "take a ride" with his friend Isaiah, the victim of the shooting and operator of the vehicle,

_____

[3] This officer was wearing the body camera that captured the footage we reviewed.

4

from their neighborhood in Randolph to his friend's aunt's home in Dorchester.  When they were slowly driving on a side street looking for parking near the aunt's home, they were approached by three men wearing hoodies and masks on their faces from a driveway on the right side of the street.  The juvenile stated that one of at the masked man, wearing a COVID-19 surgical mask, crept up along the left side of their vehicle and started shooting at them.  Isaiah, who was struck in the head by a bullet, lost control of the vehicle, which was rolling down a hill.  The juvenile explained that because Isaiah's foot was stuck on the gas pedal, he had to jump into the driver's seat and attempt to control the vehicle.  However, after crashing through two gates at the end of the street, the vehicle eventually struck a tree.  The juvenile then called 911 and a couple of bystanders came up to the car to see if they needed help.[4]  He went on to report that his ribs hurt, and his lips were split from hitting his face on the steering wheel.

After the juvenile finished recounting the shooting and the accident, Callahan asked the juvenile clarifying questions about the shooting and the suspects.  He also asked the juvenile questions about, inter alia, the purpose of visiting Isaiah's aunt's home, whether the juvenile and Isaiah were planning on

---

[4] The juvenile remained nearby and waited for emergency personnel to arrive.

purchasing drugs, or whether they were involved in any gangs. Kornetsky asked the juvenile about the last time he rode in Isaiah's vehicle, and if he knew if anyone else drives the vehicle. At the conclusion of the questioning, Callahan took pictures of the juvenile so the police could later identify the juvenile in any video footage from the area. Callahan also informed the juvenile that they would call EMS to have the juvenile's injuries checked out and they would allow the juvenile to use the bathroom to get cleaned up. Neither Callahan nor Kornetsky asked the juvenile about the firearm recovered from the vehicle. The first interview then concluded at 10:27 P.M.

Following the first interview, at approximately 10:45 P.M., two uniformed police officers began transporting the juvenile to his mother's home in Roxbury. Approximately four minutes into the ride, the police unit turned around and brought the juvenile back to the police station. Officer Delahanty, who responded to the scene of the shooting, testified at the motion hearing that while at the scene he contacted Callahan seeking updates from the interview and inquired of Callahan what the juvenile said about the firearm. Callahan informed Delahanty that he "didn't even it bring it up" and told him he was going to interview the juvenile again in order to question him about the firearm. Callahan then contacted the juvenile's mother and aunt.

6

At 11:42 P.M., the juvenile was interviewed again by Callahan and Kornetsky, this time with his mother present.  At the start of the second interview, Callahan explained to the juvenile that he had informed the juvenile's mother that Isaiah was in very critical condition.[5]  The juvenile responded that he received a phone call that Isaiah had passed away.  Callahan then informed the juvenile that there was a firearm in the car that the juvenile was riding in, and cautioned "I don't want you to say a word [. . .] [w]e need to have a conversation but because there's a gun, it's a violation of the Mass[achusetts] General Laws.  You're entitled to your Miranda warnings. Because you're seventeen, we need a parent or interested adult with you."  Callahan explained that he first thought the juvenile was simply "in the wrong area at the wrong time," but given the gun found in the car he was not sure if that was still the case and that it was now a homicide investigation and "it looks ugly."  Callahan then said, "what I'd like to do, is I'd like to advise you of your rights, and you and your mother can have a conversation, and then we can figure out whether you want to talk to us or not, okay?"  Callahan then presented the juvenile and his mother with a Boston police department juvenile

_____

[5] Prior to the start of the interview, the juvenile and his mother declined an opportunity to speak without detectives present.

7

Miranda form and began to read the juvenile each of his rights from the form.  Callahan told the mother and the juvenile to initial to indicate their understanding after he read each right, and the juvenile and his mother did so.  After reading the seventh and final right listed on the form, which states that the juvenile has had the opportunity to consult an interested adult, Callahan stated, "If you guys need a couple of minutes, you can take . . . as much time if you want to talk amongst yourselves."  Neither the juvenile nor his mother responded, but both initialed the form.  Callahan then asked both the juvenile and his mother to sign and put their dates of birth at the bottom of the form, and both did so.

After the juvenile and his mother signed the form, Callahan again inquired whether the juvenile and his mother needed time to speak amongst themselves or if they were okay with having a conversation with him and Kornetsky.  He also informed them that they had the right to take a break or stop the interview at any time of their choosing.  After neither the juvenile nor his mother responded, Callahan initiated questioning.  When Callahan asked the juvenile who the gun found in the car belonged to, the juvenile responded "[m]e and Isaiah's."  However, after subsequent questioning, the juvenile revealed that both he and Isaiah each possessed a firearm, and that there were two guns in the vehicle at the time of the shooting and accident.  Shortly

8

thereafter, the juvenile's mother answered a phone call during the interview and told Callahan that the juvenile's grandparents were outside of the building and that his grandmother said that the juvenile should not say anything until they came up. At this point, the detectives stepped out of the room to escort the grandparents up to the interview room.

Prior to leaving, Callahan informed them that the audio and video from the room would continue to record while the detectives were gone. Nevertheless, when they were alone in the room, the juvenile's mother asked him "why did you say that you had a gun?" and told him that she was tapping his leg and kicking him in an attempt to get him to stop talking. She then encouraged the juvenile to respond to subsequent questioning by saying "I don't know." She further explained police tactics to him referencing how the detective kept asking about the gun and noted, "That's what they do, that's exactly what they do." She then left room to accompany the detective to the lobby to get the juvenile's grandparents. The second interview was terminated after the juvenile's paternal grandfather stated that he did not want the detectives to ask the juvenile any more questions until he had a lawyer. Callahan also informed the juvenile and his family that the detectives had been in consultation with the district attorney's office and that the juvenile was not free to leave the homicide unit that night. He

9

was also informed that the detectives would be taking pictures of him along with his fingerprints.

Two firearms were ultimately found in the vehicle, and the juvenile was subsequently indicted on three offenses related to the unlawful possession of a firearm.  The juvenile moved to suppress all statements he made to police during the first and second interviews.  The motion was denied.  The juvenile now appeals from the order denying his motion.

Discussion.  1.  The first interview.  "In reviewing a decision on a motion to suppress, we accept the judge's subsidiary findings absent clear error but conduct an independent review of [the] ultimate findings and conclusions of law" (quotations and citations omitted).  Jones-Pannell, 472 Mass. at 431.  Here, the juvenile argues that while the motion judge correctly concluded that he was in custody during the first interview the judge erred by finding that he was not subject to an interrogation at that time.  We agree.

It is well settled that the requirements of Miranda[6] are triggered when a suspect is subject to custodial interrogation.  Commonwealth v. Torres, 424 Mass. 792, 796 (1997).  Whether a suspect is in custody for Miranda purposes is an objective determination involving "[t]wo discrete inquiries. . . .

---

    [6] Miranda v. Arizona, 384 U.S. 436, 444-445 (1966).

10

[F]irst, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave" (quotations and citation omitted). J.D.B. v. North Carolina, 564 U.S. 261, 270 (2011). See Commonwealth v. Sneed, 440 Mass. 216, 220 (2003) (critical question in custody determination is whether, considering all circumstances, a reasonable person in defendant's position would have believed they were in custody). To aid in making this determination, the Supreme Judicial Court has set forth four indicia of custody:

> "(1) the place of the interrogation; (2) whether the officers have conveyed to the person being questioned any belief or opinion that the person is a suspect; (3) the nature of the interrogation, i.e., whether the interview was aggressive or, instead, informal; and (4) whether, at the time the incriminating statement or statements were made, the suspect was free to end the interview by leaving the place of the interrogation or by asking the interrogator to leave, or, alternatively, whether the interview terminated with the defendant's arrest."

Sneed, supra. "There is no specific formula for weighing the relevant factors, but rarely is any single factor conclusive" (quotation and citations omitted). Id. An individual's age is relevant to the custody inquiry, because age can impact how a reasonable person "would perceive his or her freedom to leave" (citation omitted). J.D.B., supra at 271.

11

Custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."  Miranda v. Arizona, 384 U.S. 436, 444 (1966); Commonwealth v. Libby, 472 Mass. 37, 41 (2015).  "[T]he term "interrogation" under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."  Rhode Island v. Innis, 446 U.S. 291, 301 (1980).

As an initial matter, and notwithstanding the Commonwealth's contention otherwise, we agree with the motion judge that a reasonable seventeen year old in the juvenile's position would have believed he was in custody during the first interview.  See Sneed, 440 Mass. at 220.See also J.D.B., 564 U.S. at 270.  Here, as the motion judge found, the juvenile was surrounded by police officers shortly after being the victim of a traumatic shooting and car accident.  After Brooks approached the juvenile and asked him for his date of birth and contact information, he told the juvenile "we're gonna have you go to the office, we'll give you a ride, [and] talk to the detectives," and then pat and frisked the juvenile.

12

Additionally, while in front of the juvenile, one of the officers who ultimately transported the juvenile to the police station relayed to a fellow officer that "he's gonna come with us." Although it was known to Brooks and the two officers that transported the juvenile that he was a minor, the juvenile was not asked to contact a parent or relative, nor was he asked if he would be willing to voluntarily go with the officers to the police station. Instead, he was informed and instructed as to what the next steps in the investigation were going to be and what the police intended to do with him. Then, when the juvenile arrived at the police station, he was escorted by two officers to a second-floor interrogation room in the homicide unit, where Callahan directed the juvenile to sit in the corner of the room and told the juvenile that their conversation would be recorded. See Sneed, 440 Mass. at 220 (place and nature of interrogation are indicia of custody). Although Callahan asked at the start of the interview whether the juvenile had contacted his parents, Callahan did not ask the juvenile if he would like the opportunity to do so after the juvenile responded that he had not. Moreover, neither Callahan nor Kornetsky told the juvenile he was free to terminate the interview or leave the police station at any time of his choosing. And, while not aggressive, the first interview was not informal. Sneed, supra at 220. As discussed below, the juvenile was asked numerous

13

pointed questions, a few of which were incriminating, and was not simply treated as a witness to the shooting. Id. Given these circumstances, the motion judge did not err in concluding that the juvenile was in fact in custody during the first interview.[7]

That said, the motion judge did err in concluding that because the questions posed to the juvenile during the first interview were "investigatory and non-inculpatory in nature" that the juvenile was not subject to an interrogation. To be sure, Callahan questioned the juvenile about how the shooting transpired and any details he had regarding the shooters. Importantly, however, he also asked the juvenile why he was traveling with Isaiah, if he or Isaiah were involved in any gang activity, or if they had engaged in any drug transactions, seemingly intending to uncover whether the shooting was targeted and why it occurred. Furthermore, notwithstanding the conversational tone of the first interview, Callahan was aware that a firearm was recovered from the vehicle and his

_____

[7] The Commonwealth argues that the juvenile was not in custody during the first interview, seizing on the nonaggressive nature of the first interview, as well as the fact that the juvenile was not handcuffed by police and did not decline to go to the police station. However, the cases cited by the Commonwealth, including Commonwealth v. Hilton, 443 Mass. 597, 611-613 (2005), Commonwealth v. Miranda, 484 Mass. 799, 835-836 (2020), and Commonwealth v. Amaral, 482 Mass. 496, 501 (2019), are factually distinct and do not involve a juvenile defendant who had just been subjected to a traumatic violent crime.

14

questioning could have prompted the juvenile, who had just been the victim of a traumatic shooting, to disclose the presence of the firearm. Regardless of the detectives' motivations, however, the juvenile was subject to "questioning initiated by law enforcement officers after [being] taken into custody." Commonwealth v. Clarke, 461 Mass. 336, 342 n.4 (2012), quoting Miranda, 384 U.S. at 444. As such, because the juvenile was subject to a custodial interrogation during the first interview, his Miranda rights were violated by the detectives' failure to furnish him with Miranda warnings prior to the commencement of questioning. See Torres, 424 Mass. at 796. See also Commonwealth v. Dustin, 373 Mass. 612, 614 (1977) ("Miranda decision requires that warnings be given prior to any questioning of a person in custody").

2. The second interview. The juvenile contends that the motion judge erred in finding that he voluntarily waived his Miranda rights during the second interview. In support of this argument, the juvenile asserts that (1) he did not expressly state that he wished to waive his Miranda rights; (2) he invoked his right to remain silent at the start of the second interview; and (3) that his mother lacked the capacity to serve as an interested adult rendering his waiver involuntary. We disagree.

Where an individual "was advised of, and waived, the Miranda rights, the issue becomes whether the Commonwealth has

15

proved the validity of a Miranda waiver beyond a reasonable doubt" (quotation and citation omitted). Commonwealth v. Melo, 472 Mass. 278, 293 (2015). The Commonwealth's heavy burden "grows heavier still when the defendant is a juvenile, because . . . most juveniles do not understand the significance and protective function of the[ir] rights even when they are read the standard Miranda warnings" (quotation and citation omitted). Commonwealth v. Smith, 471 Mass. 161, 164 (2015). "To be valid the waiver must be made voluntarily, knowingly, and intelligently" (citation omitted). Melo, 472 Mass. at 293. "In determining whether a waiver was made voluntarily, the court must examine the totality of the circumstances surrounding the making of the waiver" (citation omitted). Id. "Relevant factors to consider include, but are not limited to, promises or other inducements, conduct of the defendant, the defendant's age, education, intelligence, and emotional stability, experience with and in the criminal justice system, physical and mental condition, the initiator of a deal or leniency (whether the defendant or police), and the details of the interrogation, including the recitation of Miranda warnings" (quotation and citation omitted). Id.

Here, the totality of the circumstances indicate that the juvenile voluntarily waived his Miranda rights. Callahan read each line of the juvenile Miranda form to the juvenile and his

16

mother, and both the juvenile and his mother initialed each line, indicating their understanding. Callahan also explicitly asked the juvenile if he understood the first three rights, and the juvenile nodded affirmatively.[8] After Callahan was finished reading the form, the juvenile and his mother signed the bottom of the form, again affirming their understanding of the juvenile's rights. After the juvenile was apprised of his rights, Callahan offered the juvenile and his mother time to speak amongst themselves, which they declined. At no time was Callahan confrontational or coercive, and the juvenile proceeded to answer his questions. Considering these circumstances, the motion judge did not err in concluding that the juvenile waived his Miranda rights despite his failure to provide an express waiver. See Melo, 472 Mass. at 293-294 (finding valid waiver where defendant signed notification of rights form, indicated he understood rights, and subsequently engaged in discussion with officers).

Additionally, although the juvenile contends that he invoked his right to remain silent at the start of the second interview, the juvenile admits that his initial silence was in

_____

[8] The first three rights are numbered on the juvenile Miranda form as follows: (1) You have the right to remain silent; (2) Anything you say can be used against you in a court of law; and (3) You have the right to talk to a lawyer for advice before we ask you any questions and to have him/her with you during questioning.

17

direct response to Callahan's directive that he should not say a word until he was first informed of his rights. This voluntary silence, which was not in response to any questioning, does not amount to an obvious "unwillingness to speak . . . which can be considered tantamount to the exercise of the right to remain silent." See Commonwealth v. Selby, 420 Mass. 656, 662 (1995), and cases cited therein.

The juvenile also argues that his mother could not serve as an interested adult based on testimony from the juvenile's expert witness, Dr. Biswas, that the juvenile's mother suffers from "significant intellectual deficits" and had an acute trauma response at the time of the second interview due to posttraumatic stress disorder. We are not persuaded and agree with the motion judge that the juvenile had "a genuine opportunity for a meaningful consultation with an interested adult" before he waived his Miranda rights. Commonwealth v. Leon L., 52 Mass. App. Ct. 823, 826 (2001). The judge ultimately declined to "credit or adopt Dr. Biswas' opinion" because, inter alia, the video of the second interview, "which had been created contemporaneously, . . . contradicted Dr. Biswas's conclusions." In reviewing a ruling on a motion to suppress, we "defer to [the motion judge's] assessment of the credibility of the testimony taken" and find no reason not to do

18

so here.[9]  _Commonwealth_ v. _Regan_, 104 Mass. App. Ct. 623, 626 (2024).  Critically, we note that when the detectives left the interview room, the mother reprimanded the juvenile for admitting that he possessed a gun and advised him to respond "I don't know" to any further questioning.  She also attempted to advise her son on the techniques employed by police when questioning subjects in an effort to elicit inculpatory statements.  This interaction reflects that the mother was aware of the potential consequences of the interview and had the capacity to act, and indeed acted, as an interested adult.  _Leon L._, 52 Mass. App. Ct. at 826-827 (interested adult must have capacity to appreciate situation and render advice).

3.  _Attenuation_.  The juvenile lastly argues that the taint of the illegality of the first interview was not sufficiently attenuated from the second interview thus infecting the second interview as well and mandating its suppression.  We are not persuaded.

---

[9]  We also discern no error in the judge's decision not to qualify Dr. Lahaie, who the judge noted does not specialize in trauma, as an expert or to credit his conclusions that the juvenile was unable to understand and voluntarily waive his Miranda rights during the second interview because he was suffering from an acute trauma response.  See _Timmons_ v. _Massachusetts Bay Transp. Auth._, 412 Mass. 646, 649-650 (1992) (noting fact that witness is qualified as expert in one area does not qualify him to give expert opinion in other area).

It is settled law that "[i]n this Commonwealth, there is a presumption that a statement made following the violation of a suspect's Miranda rights is tainted, and the prosecution must show more than the belated administration of Miranda warnings in order to dispel that taint" (quotation and citation omitted). Commonwealth v. Osachuk, 418 Mass. 229, 235 (1994). "This presumption may be overcome by showing that either: (1) after the illegally obtained statement, there was a break in the stream of events that sufficiently insulated the post-Miranda statement from the tainted one; or (2) the illegally obtained statement did not incriminate the defendant, or, as it is more colloquially put, the cat was not out of the bag." Id.

Here, notwithstanding the violation of the juvenile's Miranda rights during the first interview, we agree with the motion judge that the juvenile's unwarned statements during the first interview did not incriminate him. During that interview, the juvenile was not asked about firearms in the vehicle and the juvenile did not mention the firearms. The juvenile also provided the detectives with an account of the shooting and accident that was consistent with the account he provided to the officers at the scene. The juvenile denied any gang involvement and denied that he was traveling with Isaiah to purchase drugs or engage in any other suspect or criminal behavior. Additionally, while the juvenile argues that simply admitting to

20

his presence in the vehicle where the firearm was found was incriminating, the police were aware the juvenile was in the vehicle virtually as soon as they arrived on the scene of the accident.  Accordingly, because the cat was not out of the bag after the first interview, the Commonwealth overcame the presumption that the juvenile's statements during the second interview were tainted by the illegality of the first interview.[10]  See Osachuk, 418 Mass. at 235.

As such, the order denying the juvenile's motion to suppress is reversed as it applies to the juvenile's statements during the first interview and affirmed as it applies to his statement's during the second interview.

So ordered.

By the Court (Desmond,
  Grant & Hodgens, JJ.[11]),

Clerk

Entered:  June 23, 2025.

---

[10] The juvenile argues, pursuant to Commonwealth v. Prater, 420 Mass. 569, 580 n.10 (1995), that this is such a case where both a break in the stream of events and a cat out of the bag analysis is required.  However, Prater instructs that "whether one or both lines of analysis is required . . . turns on the facts of the case."  Id.  We conclude that this is not such a case where both lines of analysis are required.

[11] The panelists are listed in order of seniority.